In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3801

EFRAIN SANCHEZ,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 2735—**John W. Darrah**, *Judge*.

ARGUED JANUARY 10, 2012—DECIDED NOVEMBER 2, 2012

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* Efrain Sanchez sued the City of Chicago and two of its police officers, Rick Caballero and Matthew Peterson, pursuant to 42 U.S.C. § 1983. Sanchez alleged that Caballero and Peterson had falsely arrested him, employed excessive force against him during the arrest, and failed to intervene in the misconduct of one another and other unnamed officers in connection with the arrest—all in contravention of

his Fourth Amendment right to be secure in his person from unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989). He also asserted state-law claims for battery, respondeat superior, and indemnification, although he ultimately dismissed these claims voluntarily. The federal claims were tried to a jury, which found in the defendants' favor. Sanchez now appeals, contending that the district court committed various errors in connection with the trial. Although the parties and the court at times appear to have misapprehended the prospective liability of the defendants for the acts of the unnamed officers, and although the jury was not properly instructed as to the potential liability of Officers Caballero and Peterson for failing to intervene in the alleged wrongdoing of the unnamed officers, we conclude that none of the errors that Sanchez has preserved for appeal warrants reversal. We therefore affirm the judgment.

**I.**

The claims in this case arise from an encounter that the Chicago police had with Sanchez and his brother in the early hours of April 5, 2008. Sanchez testified that he and his brother José and two of their friends, Israel Cabral and Alex Castillo, were gathered outside of José's house awaiting the arrival of one or more women they had met at a party earlier in the evening. Around the time that one of these women, Valerie Rodriguez, showed up, three unmarked police cars pulled up in front of the house and officers demanded to know what

the men were doing outside. José explained that they had been waiting for Rodriguez. Evidently not satisfied with the explanation, the officers ordered the men to place themselves against one of the cars, empty their pockets, and place the contents onto the top of the car; the men were then subjected to a pat-down. José protested that the officers had no right to search them. Officer Caballero, whom José recognized from Caballero's off-duty work as a security guard at a restaurant where José worked, seized the keys to José's house (which José had removed from his pocket and placed on top of the car) and walked toward the dwelling. Sanchez protested that Caballero had no right to enter the house without José's permission. A swearing match ensued between the officers and Sanchez, who was placed in handcuffs. According to Sanchez, Caballero, just before he entered José's house, nodded his head at a group of four or more officers who were standing near Sanchez; those officers then began to force Sanchez into a nearby alley. When Sanchez resisted, the officers kicked his legs out from underneath him and forced him to the pavement. Sanchez testified that the officers then began to hit and kick him, ignoring the protests of José and Rodriguez. José made a 911 call on his cell phone to report that the police were beating his brother. Caballero, who by this time had emerged from the house, picked Sanchez up off the ground, and the police left the scene without arresting anyone.[1]

---

[1] Sanchez would later testify that the officers never returned to him the wallet, keys, or cell phone that they took from him

(continued...)

Caballero and Peterson gave a significantly different account at trial. Caballero testified that he was on patrol with Peterson when they saw Sanchez fighting with his brother outside of José's home: "What I observed was the two brothers entangled in a combative wrestling type hold." R. 167-1 at 7. The officers stopped to break up the fight. Sanchez, whose face was bloodied, was placed in handcuffs, and all four of the men present were patted down. Caballero said he was so familiar with the Sanchez brothers that he did not ask either of them to produce identification. The officers decided there was no point in making an arrest and left the scene. They later filled out contact cards documenting the encounter which omitted any mention of a fight. Caballero wrote as the reason for the encounter that José had been "loitering"; whereas Peterson wrote that Sanchez had "made a suspicious movement as if to conceal something." *Id.* at 24, 25-26.

Sanchez's second amended complaint sought relief from Caballero, Peterson, "as yet unknown" Chicago police officers, and the City itself. R. 96 at 1 ¶ 3. As relevant to this appeal, the complaint alleged that the individual police officers had violated Sanchez's Fourth Amendment rights by arresting him without probable cause, employing excessive force in arresting him, and failing "to

---

[1] (...continued)

during the initial pat-down; and his second amended complaint included allegations that the officers unlawfully seized his property. However, as these allegations are not material to the issues we address in this appeal, we need not discuss them further.

intervene and lessen or prevent the illegal stop, search, illegal seizure, and use of excessive force inflicted upon plaintiff . . . ." *Id.* at 8 ¶ 35. A companion state claim alleged that the officers were also liable for battery and unlawful detention under the common law of Illinois. The complaint also alleged that under Illinois law, because the officers were acting within the scope of their employment when they tortiously injured Sanchez, the City was responsible for the acts of the officers pursuant to the doctrine of respondeat superior.

These claims were presented to a jury over the course of a five-day trial. Before the jury retired to consider its verdict, however, Sanchez voluntarily dismissed all of the state-law claims. The jury found in favor of Caballero and Peterson on each of the federal claims against them. Sanchez now appeals, contending that various errors in the instructions that the court gave to the jury and in the admission of evidence entitle him to a new trial.

## II.

Before we address the particular errors that Sanchez raises on appeal, a few words are in order regarding the interplay between the alleged actions of the unidentified police officers and the claims against Caballero, Peterson, and the City. This was a recurring subject of discussion and dispute among the parties and the court below, and because it has a bearing on some of the arguments that Sanchez has made on appeal, it behooves us to clarify the extent to which the named defendants, including the City, could be held liable for the acts of

any unidentified police officer who may have been re-sponsible for the injuries of which Sanchez complained.

Sanchez was never able to identify all of the officers who he believed participated in the April 5 incident, nor could he produce evidence as to which of the officers, named or unnamed, allegedly dragged him to the alley-way, tripped and shoved him to the pavement, and kicked or otherwise struck him while he was on the ground. As relevant here, the only two officers he was able to identify were Caballero and Peterson. Both officers acknowledged that they participated in the col-lective pat-down of Sanchez and the three other men, but neither could recall whether he had frisked and/or handcuffed Sanchez. Sanchez believed that Peterson may have been one of the officers who handcuffed him (although he was not sure), and he testified that Caballero was standing behind him when he was placed in hand-cuffs. Sanchez could not say that either of those two officers actually participated in the alleged alleyway beating. By Sanchez's account, Caballero had gone into his brother's apartment before the beating commenced (albeit after Caballero nodded his head at the officers who allegedly beat him) and emerged after the beating was already in progress. Peterson, on the other hand, was allegedly standing beside Sanchez during the beating, but Sanchez could not rule Peterson in or out of the group of officers who actually struck him. Apart from the alleged beating, Sanchez asserted only that either Caballero or Peterson handcuffed him at the beginning of the encounter, and may have used excessive force in doing that.

Although Sanchez was not able to identify the other officers involved in the encounter, his claims against both Caballero and Peterson, as well as the City, nonetheless were premised in significant part on the actions of the unidentified officers. It goes without saying that Caballero and Peterson would be liable to Sanchez for their own acts: so if they deliberately and unnecessarily kicked Sanchez, for example, they would be liable for that use of excessive force. But Sanchez also contended that even if officers other than Caballero and Peterson committed such wrongful acts, Caballero and Peterson could be liable for the failure to intervene and stop their fellow officers from violating Sanchez's rights. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Byrd v. Brishke*, 466 F.2d 6, 10-11 (7th Cir. 1972). In fact, as we have noted, Sanchez's second amended complaint included an express claim against the named officers for their failure to intervene in the alleged wrongdoing of their brethren. R. 96 at 8 (Count IV). Furthermore, Sanchez argued that Illinois law rendered the City liable under the doctrine of respondeat superior for the wilful and wanton acts of its police officers, even if those officers remain unidentified. *See Williams v. Rodriguez*, 509 F.3d 392, 405 (7th Cir. 2007). Sanchez's complaint, as we have noted, thus included a respondeat superior claim. R. 96 at 12 (Count X).[2]

---

[2] Below, Sanchez also posited an indemnification theory under which he could somehow pursue federal claims against the unidentified officers for which the City would be liable to

(continued...)

Although these theories had ample legal support, the district judge at first expressed a disinclination to allow Sanchez to pursue relief against one or more of the named defendants based on the acts of any unidentified police officer. The judge's primary concern appeared to be that Sanchez not attempt to pursue a judgment against any unnamed officer. *See* R. 166 at 4-6; *e.g.*, *Eison v. McCoy*, 146 F.3d 468, 471-72 (7th Cir. 1998) (plaintiff cannot seek relief against officer whose identity is not ascertained until after the statute of limitations has run). But the judge also made more sweeping remarks suggesting that he would not permit Sanchez's counsel to so much as mention any unnamed officer. R. 166 at 5-6. When Sanchez's counsel attempted to explain why, in his view, both the City and the named officers could be liable based on wrongs committed by unnamed police officers, he was cut off. *Id.* at 4-5.

Later in the trial, however, the court signaled its understanding that the City could bear respondeat superior liability under state law for the wrongful acts of its police officers, and that Peterson and Caballero could be liable under section 1983 for their failure to intervene in the wrongful acts of their unnamed colleagues. The judge, for example, indicated that he would instruct the jury as to respondeat superior liability, and he

---

[2] (...continued)
him under state law. R. 169-1 at 69-73. The district court rejected this possibility for want of any cited authority supporting it. *Id.* at 73-74. Sanchez does not press the theory on appeal, and therefore we need not consider it.

solicited proposed instructions as to the City's liability under state law for the acts of its unidentified officers. R. 169-1 at 64. And the battery instruction subsequently approved by the court indicated that the City could be liable for the actions of unidentified police officers. R. 155 at 29-30. The court also indicated that the verdict form would inquire whether Caballero, Peterson, or one or more unidentified officers had committed a battery upon Sanchez. R. 169-1 at 92-93. Moreover, while discussing the jury instructions as to the section 1983 claims, the court appeared to agree with Sanchez's counsel that Caballero and/or Peterson could be liable for the failure to intervene in the misconduct of the unnamed officers:

> What Mr. Cerda is saying . . . [is] in this case personal involvement could extend to failing to intervene. So theoretically, the jury could convict these two officers of failing to intervene in the conduct of these unknown officers.

R. 169-1 at 101.

Nonetheless, two developments at the close of the trial reflected lingering confusion by the parties, if not the court, as to liability premised on the actions of unidentified officers.

First, on the last day of the trial, just before closing arguments were to begin, Sanchez's counsel announced that he was voluntarily dismissing the state claims, including the respondeat superior claim against the City. R. 170 at 2. That announcement was followed by an off-the-record discussion to which we, naturally, are

not privy. *Id.* What led counsel to make the decision to withdraw the state claims is not at all clear, especially given the court's prior acknowledgment that the City could be liable for any wrongful acts (including battery) that were committed by an unidentified police officer. In any event, the voluntary nature of the dismissal renders it unnecessary for us to explore that subject further.

Second, the final jury instruction as to Sanchez's failure-to-intervene theory gave the jury the mistaken impression that neither Caballero nor Peterson could be held liable under federal law for failing to intervene in the use of excessive force by another officer unless one or both of these named officers himself participated in the use of such force. R. 155 at 28; R. 170 at 74-75. Specifically, the instruction—adapted from Seventh Circuit Pattern Civil Jury Instruction No. 7.16—advised the jury that the plaintiffs must first prove that "[o]ne or both of the Defendant Officers falsely detained and/or used excessive force on Plaintiff[.]" R. 155 at 28; R. 170 at 74-75. Compounding the problem, the instruction went on to state that Sanchez was also obligated to prove that "[o]ne of the Defendant Officers knew that another Defendant was falsely detaining Plaintiff and was using, or was about to use, excessive force on the Plaintiff[.]" R. 155 at 28; R. 170 at 75. The instruction thus foreclosed the possibility of holding Caballero and Peterson liable for failing to intervene in the wrongdoing of other, unnamed officers so long as neither of them participated in that wrongdoing, be it falsely detaining Sanchez or using excessive force on him. Indeed, nowhere in the instruction are the *unnamed* officers even

mentioned; the language we have just quoted refers instead to the failure to intervene in the wrongdoing of another *defendant* (or, as the instruction was read to the jury "the other defendant," R. 170 at 75). In sum, relief on Sanchez's failure-to-intervene theory was conditioned on a finding that one of the two named officers falsely detained and/or used excessive force on Sanchez, and that the other named defendant failed to intervene in that wrongdoing. The possibility that one or more unnamed officers might have falsely detained Sanchez and used excessive force on him, and that Caballero and/or Peterson failed to stop those officers from abusing Sanchez, was never communicated to the jury.

Surprisingly, this instruction was actually proposed by *Sanchez's* counsel, and was given over the objection of the *defendants*. *See* R. 155 at 28; R. 169-1 at 90-91; R. 170 at 4. At oral argument, Sanchez's counsel noted the error in the failure-to-intervene instruction, but of course Sanchez is in no position to complain now about an instruction that his own counsel proposed and that was given over the objection of the defendants-appellees. *See City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 259, 107 S. Ct. 1114, 1115 (1987) ("We think . . . that there would be considerable prudential objection to reversing a judgment because of instructions that petitioner accepted, and indeed itself requested."); *Doe by & through G.S. v. Johnson*, 52 F.3d 1448, 1460 (7th Cir. 1995) ("'in a civil case, a litigant may not attack an instruction of which he was the proponent'") (quoting *Williams v. Boles*, 841 F.2d 181, 184 (7th Cir. 1988)).

As the foregoing issues have not been preserved for review, we may conclude this discussion by making the following points. First, in a section 1983 action alleging that police violated the plaintiff's Fourth Amendment rights by subjecting him to excessive force, a defendant police officer may be held to account both for his own use of excessive force on the plaintiff, *see, e.g.*, *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 519-20 (7th Cir. 2012), as well as his failure to take reasonable steps to attempt to stop the use of excessive force used by his fellow officers, *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Abdullahi v. City of Madison*, 423 F.3d 763, 773-74 (7th Cir. 2005); *Miller v. Smith*, *supra*, 220 F.3d at 495; *Yang v. Hardin*, *supra*, 37 F.3d at 285. Second, it is possible to hold a named defendant liable for his failure to intervene vis-à-vis the excessive force employed by another officer, even if the plaintiff cannot identify the officer(s) who used excessive force on him. *See Byrd v. Brishke, supra*, 466 F.2d at 11 ("the plaintiff was entitled to have his case against defendants Moran, Pfeiffer, and Finnin submitted to the jury upon his having offered testimony that he was beaten by unknown officers in their presence"); *see also Miller*, 220 F.3d at 495 (plaintiff's inability to identify which of named defendants was his assailant did not preclude liability on excessive force claim; "[i]f Miller can show at trial that an officer attacked him while another officer ignored a realistic opportunity to intervene, he

can recover")[3] Third, under Illinois law, a municipality

---

[3] On this point, the fact that Sanchez's claims are based on the Fourth Amendment distinguishes this case from *Harper v. Albert*, 400 F.3d 1052, 1065-67 & n.19 (7th Cir. 2005). The majority in *Harper* deemed a plaintiff's inability to identify the prison guard(s) who allegedly beat him to be fatal to a failure-to-intervene claim against any named defendant guard who allegedly observed the beating and did nothing to stop it. Because the plaintiff in *Harper* was serving a prison term, his excessive force claim was based not on the Fourth but the Eighth Amendment. *Id.* at 1065. To prevail on an Eighth Amendment claim that he was subject to cruel and unusual punishment by means of excessive force, a plaintiff must show that force was employed to maliciously and sadistically cause him harm rather than in a good faith effort attempt to maintain or restore discipline. *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S. Ct. 995, 999 (1992)). The necessity to establish the mens rea of the individual who used force on the plaintiff, in the majority's view, compels a plaintiff to identify who that individual was.

> In order for courts to satisfy the mandate to inquire into the state of mind of prison officials who have allegedly caused a constitutional violation, see *Wilson* [*v. Seiter*], 501 U.S. [294,] at 299, 111 S. Ct. 2321 [(1991)], it is most imperative that we are provided with "identified culprits"; for "[w]ithout minds to examine, we cannot conduct an individualized inquiry." *K.F.P.* [*v. Dane County*], 110 F.3d [516,] at 519 [(7th Cir. 1997)].

*Harper*, 400 F.3d at 1065. Thus, the plaintiff's inability in *Harper* to identify his alleged assailant rendered him unable to establish that a violation of the Eighth Amendment had oc-

(continued...)

---

[3] (...continued)

curred, and in turn foreclosed him from arguing that a named defendant was liable for the failure to intervene in that violation.

> [A]bsent any evidence or even an allegation which could establish a constitutionally cognizable claim for excessive force against any of the defendants (*e.g.*, identification of the individual guard(s) who used excessive force against him . . .) Harper cannot possibly establish bystander liability as to Townley [a named defendant] or anyone else for failure to intervene, and his claim must fail.

*Id.* at 1066 (citation and footnote omitted). *But see id.* at 1069-70 (Flaum, J., concurring in part and concurring in the judgment) (finding plaintiff's testimony that unnamed guards gratuitously inflicted force on him in presence of named defendant guard sufficient to create jury issue on failure-to-intervene claim).

By contrast, a Fourth Amendment excessive force claim does not depend on the subjective purpose for which an officer employed force against the plaintiff, but rather on whether the force employed was reasonable. As we explained in *Richman v. Sheahan*:

> The Eighth Amendment is about punishment, so a punitive purpose must be shown in an excessive-force case litigated under that amendment—hence the language about malice and sadism that we quoted. The issue under the Fourth Amendment "is 'whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them.'" *Smith v. Ball State University*, 295 F.3d 763, 770 (7th Cir. 2002), quoting *Graham*

(continued...)

may be held liable for battery and other wilful and wanton tortious acts committed by its police officers in the course of their duties, even if the plaintiff has not been able to identify those officers. *Williams v. Rodriguez, supra*, 509 F.3d at 405; *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir. 1994); *McCottrell v. City of Chicago*, 481 N.E.2d 1058, 1060 (Ill. App. Ct. 1985); 745 Ill. Comp. Stat. 10/2-202. With those points clarified, we may now turn to the issues that Sanchez has preserved for appeal.

---

³ (...continued)
  *v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); see also *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The officers' intent in using force is irrelevant in a Fourth Amendment case. *Graham v. Connor, supra*, 490 U.S. at 397, 109 S. Ct. 1865; *Phelps v. Coy*, 286 F.3d 295, 299-301 (6th Cir. 2002). Only its reasonableness matters—which means whether it was excessive in the circumstances, because if it was, it was unreasonable—and reasonableness is the focus of the briefs of both sides in this case.

512 F.3d 876, 882 (7th Cir. 2008). Thus, in the Fourth Amendment context, it is not essential that the identity of the individual officer who applied the force be established. If the plaintiff can establish that an unknown officer subjected him to excessive force, he may seek to hold liable other, named officers who were present, observed the use of excessive force, had a reasonable opportunity to stop the use of that force, and failed to intervene. *See Miller*, 220 F.3d at 495, and *Byrd*, 466 F.2d at 11.

A. Personal Involvement Jury Instruction

At the request of the defendants, the district court gave the following instruction, adapted from Seventh Circuit Pattern Civil Jury Instruction No. 7.02, to the jury:

> In order to hold Defendant Officers Rick Caballero or Matthew Peterson individually liable, Plaintiff must prove by a preponderance of the evidence that each was personally involved in the conduct Plaintiff complains about. You may not hold Defendants Caballero or Peterson liable for what other employees did or did not do.

R. 155 at 33; R. 170 at 75-76. Sanchez objected to this instruction. He maintained that the instruction was misleading, to the extent that it could be understood to suggest that neither Caballero nor Peterson could be held liable for excessive force perpetrated by another officer unless he participated in the use of that force. The district court at first was sympathetic to this argument, and it invited Sanchez's counsel to submit language that would harmonize the personal involvement instruction with the instruction as to Sanchez's failure-to-intervene theory of liability. R. 169-1 at 103. But once defense counsel represented to the court that one of the plaintiff's attorneys, who evidently was no longer involved in the case, previously had agreed to the wording of the instruction, the court approved the defense version of the instruction over the plaintiff's objection. *Id.* at 104. When the court addressed the jury instructions for the final time on the last day of trial, Sanchez's counsel reminded the court that it had

invited the parties to confer overnight regarding any outstanding disputes, and counsel indicated he was proposing an additional sentence for the personal involvement instruction that would inform the jury "that the failure to intervene can[ ] constitute a form of personal involvement." R. 170 at 5. The court reiterated that it had already overruled Sanchez's objection to this instruction, and once it confirmed that defense counsel had not agreed to the additional language that Sanchez proposed, the court rejected the proposed modification. *Id.*

A threshold argument that Sanchez makes on appeal is that it was inappropriate to give the personal involvement instruction in a case that does not involve supervisory liability, but this is a nonstarter. It is true that the personal involvement pattern instruction was drafted with supervisory liability cases in mind; the two cases cited in the committee comments to the pattern instruction, *Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986), and *Duckworth v. Franzen*, 780 F.2d 645, 650 (7th Cir. 1985), both address supervisory liability. But supervisory liability is merely one form of liability which is premised on a defendant's failure to intercede in the wrongdoing of another individual and which thus presents the danger that the jury will deem the defendant vicariously liable for the actions of the other person, without regard to whether the defendant actually had notice, opportunity, and the ability to prevent the other person from inflicting harm. Liability premised on a defendant police officer's failure to intervene in the actions of another officer presents the

same danger, and it is thus within a court's discretion to give the personal involvement instruction in a failure-to-intervene case to address that danger. Indeed, the committee comments themselves envision that the personal involvement instruction may be given in such a case: that is why the comments suggest that when the jury will also be instructed on the failure to intervene pursuant to Pattern Civil Jury Instruction No. 7.16, the court consider adding language harmonizing the two instructions. *See* Seventh Circuit Pattern Civil Jury Instruction No. 7.02, committee comments.

Which brings us to Sanchez's primary argument. The language that Sanchez proposed adding to the personal involvement instruction, in order to harmonize it with the pattern instruction on the failure to intervene, was appropriate. A layperson is unlikely to understand that Officer A's failure to intervene in the wrongdoing of Officer B, despite A's knowledge of and ability to stop the wrongdoing, is a form of personal involvement in B's misconduct. Yet, that is the upshot of such cases as *Miller v. Smith*, *supra*, 220 F.3d at 495, and it is the foundation for the failure-to-intervene theory of liability. Without language qualifying the personal involvement instruction, a jury might believe, mistakenly, that so long as Officer A does not himself use excessive force on the plaintiff, he can have no liability for Officer B's use of excessive force. To address that potential problem, the committee comments suggest that the failure-to-intervene instruction be given immediately after the personal involvement instruction and that the word

"however" be added as a preface to the failure-to-intervene instruction. In our view, a modest one-word addition may not suffice to harmonize the two instructions, as Pattern Instruction No. 7.16 simply delineates the elements of a failure-to-intervene claim, without any introductory language signaling that a defendant's failure to intervene in the wrongdoing of another officer qualifies as a form of personal involvement in that wrongdoing. An additional sentence explicitly advising the jury that a defendant officer's failure to intervene in the wrongful conduct of another officer, despite a reasonable opportunity do so, can be a form of personal involvement in that wrongful conduct, would be prudent. The language that Sanchez's counsel proposed was in line with our own suggestion, and the district court would have done well to entertain it. The fact that a prior attorney for Sanchez, who was no longer involved in the case, had agreed to the version of the personal involvement instruction that the court ultimately gave was irrelevant, particularly in view of the fact that the problem presented was one of reconciling that instruction with a separate instruction, and the modification that Sanchez proposed was consistent with the committee comments' own recognition that the two instructions need additional language to render them consistent with one another. It is true, of course, that Sanchez's attorney had the opportunity to reconcile the two instructions in his closing argument to the jury. But given the obvious tension between the personal involvement instruction and the failure-to-intervene instruction, the court itself should have explained to the jury

that a defendant's failure to intervene can be a form of personal involvement in the wrongdoing of another officer. An attorney's effort to reconcile competing concepts, however cogent, is likely to carry less weight with a jury, particularly when, as here, the court instructs the jury after rather than before the attorneys deliver their closing arguments and the court admonishes the jury to follow its instructions even if it disagrees with them. *See* Seventh Circuit Pattern Civil Jury Instruction No. 1.01; R. 170 at 65-66; *see also* R. 170 at 56 (in response to objection to argument that defense counsel made in closing, court instructed jury: "You must follow the law in the instruction[s], and to the extent that the law is misstated by either lawyer here, you should disregard that and follow the written instructions and my verbal instructions. You all understand.").

But ultimately the real problem in this case was the one posed by the language of the failure-to-intervene instruction that Sanchez's counsel proposed and that the court gave over defense objection. As we have noted, the modified language of the failure-to-intervene instruction erroneously advised the jury that in order to hold Caballero or Peterson liable for the failure to intervene in the misconduct of another officer, one or both of the named officers themselves must have participated in that misconduct. Additionally, the instruction did not even mention the other, unnamed officers; the instruction was premised entirely on the use of force by at least one of the named defendants. Whatever potential for misunderstanding that may have been posed by the personal involvement instruction was

thus eclipsed by the flawed language of the failure-to-intervene instruction. The latter instruction as given expressly precluded the jury from holding Caballero and Peterson liable for failing to stop the false detention and/or battering of Sanchez unless one or both of the defendants were themselves perpetrators of those wrongful acts. Any modification to the wording of the personal involvement instruction thus would have done Sanchez no good whatsoever in view of the hopelessly defective language of the failure-to-intervene instruction.

In short, any error in the court's refusal to embrace the language that Sanchez posed to harmonize the personal involvement instruction with the failure-to-intervene instruction was harmless. The real fault lies with the failure-to-intervene instruction itself, which was proposed by Sanchez. Having been the proponent of the flawed failure-to-intervene instruction, Sanchez is foreclosed from objecting to that instruction now.

B.   Testimony of Investigator Brian Killen

In response to a complaint filed by Sanchez, Chicago's Independent Police Review Authority ("IPRA") conducted an investigation of the April 5, 2008 incident and cleared Caballero and Peterson of wrongdoing. Prior to trial, the district court granted Sanchez's motion in limine to exclude any testimony about the IPRA's findings. R. 179 at 25-26. At trial, however, the court permitted the City to elicit testimony from IPRA investigator Brian Killen that he had looked into an allegation that Caballero

had threatened to plant drugs on Sanchez if he did not withdraw his complaint to the IPRA. The threat was reportedly made to Sanchez's brother José. Killen testified that he spoke with José, who denied that Caballero made such a statement to him or that he had reported such a threat to his brother. Over Sanchez's objection, Killen was also permitted to testify more generally that he found no evidence to support the allegation that Caballero had threatened Sanchez: "[D]id you find any evidence to support this alleged threat to Efrain?" defense counsel inquired. "No sir," Killen answered. R. 169-1 at 38.

From the dubious premise that Killen testified as an expert, Sanchez argues that the district court erred in admitting his testimony because it was not properly disclosed in advance of the trial as required by Federal Rule of Civil Procedure 26(a)(2) and therefore was barred by Rule 37(c)(1). He argues secondarily that Killen's testimony improperly intruded upon the jury's determination as to whether the defendants violated his civil rights.

The district court did not abuse its discretion in allowing this limited testimony. It is important to emphasize first that Killen said nothing about the IPRA's conclusion as to the April 5, 2008 incident; his testimony was confined to the collateral allegation that Caballero had threatened to retaliate against Sanchez if Sanchez did not withdraw his complaint. So the testimony did not invade the jury's province to decide what occurred on April 5, 2008. Second, Killen did not testify

as an expert. His testimony was limited to what he was able to ascertain as a result of his own investigation into a particular allegation. Rather than opining, based on a body of specialized knowledge and experience, whether Caballero made a threat or whether Sanchez was dissembling, Killen simply reported that he found no evidence to support the allegation. *See*, *e.g.*, *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012) (law enforcement official is giving lay opinion if he is testifying to what he observed or to facts derived from his investigation); *DeBiasio v. Ill. Cent. R.R.*, 52 F.3d 678, 686 (7th Cir. 1995) (witness is not expert to extent he testifies to matters within his personal knowledge). Moreover, Killen's testimony was offered for the purpose of impeaching Sanchez's credibility, so it was not subject to the disclosure rules governing expert testimony. Rule 26(a)(3)(A); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005) (citing *DeBiasio*, 52 F.3d at 686). Third, the objected-to portion of Killen's testimony could not have prejudiced Sanchez in any meaningful way. Sanchez did not object to Killen's testimony that José, when questioned about Caballero's alleged threat, denied having heard a threat by Caballero or reporting such a threat to his brother. R. 169-1 at 30, 32, 33. That was the most damaging portion of Killen's testimony, as it directly refuted what Sanchez had reported to the IPRA about the threat. Killen's additional testimony that he otherwise found no evidence to support the allegation that a threat had been made, was essentially punctuation. To the extent Killen's testimony necessarily disclosed the fact of the IPRA's investi-

gation into the April 5 incident, it is worth pointing out that Sanchez's own counsel had already elicited testimony in the case about the IPRA investigation and had introduced materials from that investigation. *See*, *e.g.*, R. 166-1 at 107; R. 167-1 at 17-20; *see also* R. 166-1 at 6-7 (plaintiff's opening statement).

### C. Prior Arrests

Over Sanchez's objection, the district court permitted the defense to establish, on cross-examination of Sanchez, that he had been arrested on several occasions in the ten years prior to the trial; the court did not allow evidence concerning Sanchez's prior convictions. R. 167-1 at 91-92. The district court deemed Sanchez's arrest history relevant in view of his testimony, on direct examination, that he had suffered emotional distress as a result of the way in which he was treated in the April 5 encounter. Sanchez testified that he had become afraid of the police, that he had nightmares about them, that he did not trust them, and became nervous when he saw them. *Id.* at 78-80. In the court's view, that testimony gave rise to an inaccurate impression that Sanchez had no real prior experience with law enforcement officials; and "common sense" suggested that an individual who had many prior interactions with the police would be less likely to suffer emotional distress from an encounter like the one Sanchez described than an individual who had never before had contact with the police. *Id.* at 85, 86, 88-91. However, in order to limit the prejudice that might result from dis-

closure of Sanchez's arrest record, which was lengthy (reportedly, Sanchez had a record of more than thirty arrests in the ten years prior to trial), the court directed defense counsel to ask Sanchez only whether he had "several" prior arrests in those years. *Id.* at 92. Furthermore, immediately after Sanchez answered "yes" to this question, *id.* at 96, the court instructed the jury that it could consider this information "only insofar as it bears on Mr. Sanchez's testimony that he suffered extreme emotional distress . . . because of the actions on the night of April 5th, 2008, for that limited purpose only," *id.* The court then asked the jury members whether they understood the court's instruction, and all indicated that they did. *Id.*

At the conclusion of the trial, in his closing argument to the jury, defense counsel returned to the subject of Sanchez's prior arrests, and based on that history argued that it was unlikely Sanchez had suffered genuine emotional distress:

> Is this really [a] babe in the woods? This innocent who has been traumatized? He's been arrested more times than you can shake a stick at.

R. 170 at 48. Sanchez's counsel immediately objected to this characterization of Sanchez's arrest record. The court sustained the objection and instructed the jury to disregard the statement, reminding the jurors, "You've heard the evidence. He was arrested several times." *Id.*

Sanchez argues that the district court was wrong to allow evidence concerning his prior arrests. He reasons that his arrest history had little if any bearing on the

degree of emotional distress he suffered as a result of the April 5, 2008 encounter, given that his claim was that he was not simply wrongfully stopped and detained, but beaten by police officers. He reasons further that defense counsel's intemperate remark in closing both mischaracterized and gave emphasis to this evidence, magnifying its prejudicial effect.

Reasonable people might disagree as to the probative worth of Sanchez's arrest history. Given Sanchez's allegation that he was manhandled (and worse) by the officers who dealt with him on April 5, the fact that he had been arrested on multiple occasions before—presumably without excessive force—arguably does not undermine his claim of trauma. There is, after all, a material difference between being arrested and being subjected to excessive force in the course of that arrest. On the other hand, Sanchez's claim was not limited to the alleged use of excessive force; he also alleged that he was falsely detained. Had the jury rejected his allegation that he was beaten, but agreed that he was falsely detained, his prior arrest history arguably might have been relevant to the jury's assessment of any emotional distress he suffered as a result of the improper detention.

In any case, we have a difficult time discerning how Sanchez was materially prejudiced by the disclosure of his prior arrests. The court, as we have noted, limited the evidence to the fact that Sanchez had "several" prior arrests, and gave a limiting instruction admonishing the jury that it was to consider this evidence only insofar

as it shed light on the extent of any emotional harm he experienced. Defense counsel indeed was out of line when he stated in closing that Sanchez had more convictions "than you can shake a stick at," but Judge Darrah both sustained Sanchez's objection and reminded the jury what the actual evidence was as to the extent of Sanchez's arrest history. Thus, even if we were to assume that the court erred in allowing limited evidence of Sanchez's arrest record, the error was harmless.

D. Gang-related Testimony

Officers Caballero and Peterson were members of a gang unit, but it was agreed among all parties that their decision to stop and question the Sanchez brothers on April 5, 2008, was not based on any suspicion that either of the brothers was engaged in gang-related activity. *See* R. 167-1 at 5; R. 169 at 14, 62, 65-66. During pretrial discovery, it emerged that Sanchez did have some history of gang affiliation. R. 137. In advance of the trial, Sanchez moved to exclude any reference to gang activity, and the district court granted that motion to the extent of excluding any reference to Sanchez's gang activity. R. 179 at 18. Sanchez contends that the defendants nonetheless went on to mention gangs frequently during the trial, with one witness (Officer Reynaldo Serrato) testifying that José Sanchez's home was known for having noise disturbances and gang-related parties. R. 169 at 5-6. The district court sustained Sanchez's objection to this particular testimony, but in Sanchez's view the bell could not be unrung; and he

contends that when defense counsel remarked in closing argument that Sanchez had more arrests "than you can shake a stick at," the jury must have surmised that Sanchez "was a gang banger who should not be awarded any damages." Sanchez Br. 27.

This argument makes too much of very little testimony connecting Sanchez with gang activity. The word "gang" was uttered on a number of occasions during the trial, but in the great majority of instances in the context of identifying the individual defendants' assignment within the Chicago police force. This was not prohibited by the district court's in limine ruling, and plaintiff's counsel was equally responsible with defense counsel in eliciting this information. *See*, *e.g.*, R. 166-1 at 3, 70, 78; R. 167-1 at 3, 4-5. As evidence of an officer's experience, assignment, and qualifications, the mere mention that the officer is a gang specialist or assigned to a gang unit typically is appropriate and harmless. *See*, *e.g.*, *Anderson v. Sternes*, 243 F.3d 1049, 1053-54 (7th Cir. 2001). Indeed, these references were not objected to by Sanchez. The only potentially problematic reference was Officer Serrato's reference to gang-related parties occurring at or near José's home; but the district court sustained the objection to that remark and instructed the jury to disregard it. We presume that the jury follows such instructions. *Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994) (coll. cases). As Sanchez himself concedes, "[a]t trial, there was no suggestion from anyone that Mr. Sanchez was engaged in gang activity at the time of the incident, or that the officers'

treatment of him was based on gang affiliation." Sanchez Br. 27. In this context, Serrato's isolated remark, which the court instructed the jury to disregard, was not sufficiently serious to have prejudiced Sanchez.


E.   Prior Fight Between Sanchez Brothers

Over objection, the district court allowed the defense to ask Sanchez if he had fought with his brother prior to April 5, 2008, and, more specifically, whether Caballero had ever broken up a fight between them prior to April 5. Sanchez denied that they had ever fought, be it on April 5 or on any other occasion. R. 167 at 38-39. The defense posed that question to Sanchez in anticipation of Caballero's testimony that he had witnessed a fight between the brothers on an occasion prior to the April 5 incident. Subsequently, when Caballero was on the witness stand, Sanchez's counsel asked him why he had not indicated on the contact card he completed after the April 5 incident that Sanchez and his brother were fighting. Caballero answered:

> In this case Efrain and his brother were fighting. I have seen them fighting before, seen Efrain numerous times, and I've let him go. He's begged me to let him go. And at this point I did the same thing.

R. 167-1 at 30. Caballero was then asked (by plaintiff's counsel) about the prior fight Caballero claimed to have witnessed, and Caballero said that he previously had encountered Sanchez and his brother engaged in a shoving match. "We broke them up and they went on their

way," Caballero explained. *Id.* at 31. Defense counsel then explored the subject further when Caballero was re-called in the defense case. R. 169 at 64-65. Sanchez argues that the court erred in permitting the defense to open this subject by allowing the initial questions of Sanchez, which in turn led to Caballero's testimony about the prior shoving match.

The court allowed this evidence as relevant to explain why Caballero and Peterson did not arrest Sanchez or his brother on April 5 nor document a fight between the two brothers on the contact cards they filled out after the incident, despite their testimony that they had observed the brothers in a physical altercation and that Sanchez was bleeding as a result of the fight. This was a subject that Sanchez's counsel had touched upon in his opening statement to the jury and on which he had questioned both officers. R. 166-1 at 5-6; *id.* at 74-75, 88, 90-91; R. 167-1 at 25, 26-27. Clearly one inference that Sanchez wanted the jury to draw was that the fight was a fabrication; otherwise, the logic goes, the officers surely would have documented the fight if not arrested one or both of the brothers.

Sanchez's concern is that the jury likely relied on the prior fight not as evidence of what motivated the defendants not to arrest him or his brother on April 5 if they had in fact been fighting as the defense claimed, but rather as confirmation of the defense account that there was a fight between the brothers on April 5. In other words, Sanchez posits that this testimony con-stituted proof of a prior bad act (the fight), offered to

show a character trait (fighting, especially with one's brother) with which Sanchez was acting in conformity on the night in question. *See* Fed. R. Evid. 404(a)(1).

Because this evidence was at least minimally relevant to explain why the defendants might have decided legitimately not to arrest the Sanchez brothers on April 5, and thus had a bearing on something other than their propensity to fight, it was within the district court's discretion to admit the evidence. In any event, we find it difficult to believe that the testimony prejudiced Sanchez. The testimony that the brothers had fought before came from the same, self-interested source (Caballero) who asserted that the brothers were fighting on April 5. The jury was thus unlikely to rely on the testimony regarding the prior fight as independent verification of Caballero's disputed contention that the brothers were involved in a fight on April 5. Moreover, coming to blows with one's sibling, although it may technically be illegal, is an experience known to, if not shared by, many individuals, and the disclosure of such a history is not inherently prejudicial as would be the disclosure of other prior crimes. Caballero himself remarked during his testimony, "[M]yself, I fought with every one of my brothers, so I know how that goes, so I didn't think it was a reason to lock anybody up." R. 169 at 72; *see also* R. 167-1 at 30 ("I fought my brothers hundreds of times . . . .").

F.   Cumulative Effect of Disputed Evidentiary Rulings

Sanchez has argued that even if any of the evidentiary rulings that he contests were not prejudicial individually,

together they deprived him of a fair trial. We have considered this argument but, upon review of the record, find it to be without merit.[4]

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[4] In his statement of facts, Sanchez has suggested that the district court erred in admitting his original and amended complaints into evidence for impeachment purposes over his objection. Sanchez Br. 15. However, he has not developed this argument in the body of his opening brief or, for that matter, in his reply brief. We consider the argument waived for lack of development. *E.g.*, *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010).