In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2562

TERRENCE BARBER,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 6363 — **John W. Darrah**, *Judge.*

ARGUED FEBRUARY 11, 2013 — DECIDED AUGUST 2, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and TINDER,
*Circuit Judges.*

TINDER, *Circuit Judge.* This suit, brought under 42 U.S.C.
§ 1983, stems from the December 14, 2005, arrest of then-14-
year-old Terrence Barber by Chicago police officers Michael
Malaniuk and Michael Shields. Barber claims that the officers
arrested him without probable cause and that Officer Malaniuk
used excessive force in gratuitously shoving him into a holding

cell, causing him to strike his head on a hard surface. The officers deny these allegations and say that Barber's head injury occurred because he was intoxicated and fell over his own feet. A jury sided with the defendants, and the district court denied Barber's motion for a new trial. Barber appeals, claiming that several of the district court's evidentiary rulings and other actions prejudiced his case. Though some of Barber's claims are baseless, his contentions that the district court committed reversible error when it allowed defense counsel to cross-examine him about a subsequent arrest for underage drinking and about his intervening felony conviction both have merit. We therefore reverse the district court's order denying Barber's motion for a new trial, vacate the judgment, and remand for a new trial.

## I

The parties offer drastically different accounts of the events surrounding Barber's arrest. The general rule is that on appeal from a jury verdict this court will view the facts in a light most favorable to the verdict. *See Common v. City of Chicago*, 661 F.3d 940, 942 (7th Cir. 2011). This standard of review is sensible in many instances, such as when the issue is whether the verdict is supported by sufficient evidence. But it does not make as much sense when the issue on appeal is whether the district court committed reversible error in admitting or excluding evidence, because whether there was reversible error turns on an analysis of the evidentiary ruling in the context of the entire trial record, *see Kotteakos v. United States*, 328 U.S. 750, 761–65 (1946). Indeed, we routinely set out the conflicting evidence in appeals challenging a district court's evidentiary rulings or jury instructions. *See, e.g., Griffin v. Bell*, 694 F.3d 817, 819–20

(7th Cir. 2012); *Guzman v. City of Chicago*, 689 F.3d 740, 742–44 (7th Cir. 2012). We do the same here, beginning with Barber's version of events.

According to Barber, after he got home from school (he was in the eighth grade) on the day of the incident he played video games with his brother in the family's apartment at the Marshall Field Gardens housing project. At some point that evening, Barber's mother called and asked him to go downstairs and wait for her outside the building so that he could help her with the groceries. While Barber waited outside for his mother, his friend Michael Jones walked up, followed by Barber's girlfriend and one of her friends. The youths stood off to the left of the building and chatted for a while. They were not blocking any entrances, were not bothering anyone, and were not drinking.

At some point Malaniuk and Shields arrived in their marked police car. Officer Malaniuk got out of the car, spoke with a security guard, and then went into the building. Meanwhile, Officer Shields approached Barber and his friends and asked Barber for his name and the reason he was standing outside; Barber gave his name and said that he was waiting for his mother. Shields "started to use profanity, like F you and your mother and get the F out of here"; Barber responded, "F you, too," and did not move. Shields grabbed Barber's shirt and began searching his sweatshirt, pants, and back pockets. Shields threw Barber's possessions into the snow, shoved him, and told him to "get the F out of here." Shields and Malaniuk then got back into their car and began driving away, but the officers abruptly executed a U-turn and returned. The officers got out of the car and told Barber and Jones "to get the F on the

wall"; Barber and Jones complied. Both were handcuffed and placed into the police car. Barber testified that he was not drunk, that he was not unsteady on his feet, that he was not swaying in the backseat of the car, and that neither he nor the car smelled of alcohol.

Barber and Jones were transported to the station house. Once there, Malaniuk yanked Barber out of the car by the hood of his sweatshirt, causing him to stumble over a brick and land on his back. Barber did not get up, so Malaniuk dragged him by his hood for about 12 to 14 feet to a holding cell. At the holding cell's entrance, Malaniuk stood Barber up and forcefully pushed his upper back while he was still handcuffed (behind the back), which launched him across the cell face first into a hard surface—Barber blanked out momentarily and woke up bleeding. A female officer came by, saw Barber bleeding, and decided to help him—she gave him napkins, called a janitor to clean up the blood, took Barber to the restroom, uncuffed him, let him go into the restroom to clean himself, and returned him to the holding cell.

A while later, Malaniuk and Shields returned and saw that Barber was injured; two hours after Barber sustained the injury, the officers took him to the hospital. Barber testified that he did not tell the nurse or the physician at the hospital that he had lost consciousness because Malaniuk and Shields pulled them out of the room before he had a chance to do so, and he could not remember if the nurse even asked him whether he had lost consciousness. He also testified that he was not drunk at the hospital, was not fighting, and was not struggling, though he could not recall whether he had refused to give his mother's phone number to hospital staff. Barber received

twelve stitches to seal wounds on his face and was given medication. He was then returned to the station house, booked, and placed in the youth room until his mother arrived, at which point he was permitted to leave with her.

Malaniuk and Shields have a considerably different version of events. According to them, on the evening of December 14, 2005, they responded to a 911 call from security guards at the Marshall Field Gardens housing project. When they arrived, there was a group of teenagers congregated on the sidewalk near the building. The security guards informed the officers that two members of the group—namely, Barber and Jones—were blocking the building's entrance and attempting to start fights with people entering and leaving the building. The guards signed preprinted criminal complaints alleging disorderly conduct, and on the basis of those complaints the officers placed Barber and Jones under arrest. Barber was a bit uncooperative but was successfully handcuffed without much resistance. According to Malaniuk, Barber did not fall but was "a little uneasy on his feet."

The officers transported Barber and Jones to the station house. During the short trip, a strong odor of alcohol filled the squad car and Barber was swaying side to side as he sat in the back seat—the officers testified that Barber told them that he had been drinking Martell, a brand of cognac, all day. Officer Shields dropped off Officer Malaniuk in the sally port of the station house, along with Barber and Jones, and then went to park the car.

Malaniuk escorted Barber and Jones into the holding area of the station house. Barber was still unsteady on his feet and at one point fell to the ground as he walked down a hallway. Malaniuk asked Barber to get up, but Barber did not comply so Malaniuk picked him up and got him back on his feet. Barber resumed walking down the hallway under his own power, though "[h]e was walking kind of side to side." Barber then walked into a holding cell and because of his intoxicated state tripped over his own feet and fell again. This time he struck his head on a metal bolt that secured a partition within the holding cell to the floor, causing his head to bleed. Malaniuk again helped Barber to his feet then took him to the restroom and helped him clean up. Barber never requested medical attention, but the officers agreed that they would take him to the hospital for treatment after they finished processing Jones into lockup—Barber's head had stopped bleeding and the officers figured it was a minor injury that did not require immediate medical attention. About two hours after the injury, the officers took Barber to the hospital where his wounds were stitched up. The officers testified that medical staff had relayed to them that Barber was being difficult while at the hospital.

Barber subsequently brought this action under 42 U.S.C. § 1983 against Malaniuk and Shields, asserting claims of false arrest and excessive force. Though Barber's poor briefing makes it difficult to ascertain, his false-arrest theory appears to have been that the security guards never actually signed a complaint and that the officers forged the complaint after the arrest. His excessive-force theory was based on Malaniuk's gratuitous shove, and it was stressed during trial that at the time of the incident Barber had been approximately 5'1" tall

and had weighed approximately 120 pounds, whereas Malaniuk had been approximately 6'5" tall and had weighed approximately 240 pounds. In addition to his federal claims, Barber asserted supplemental state-law claims of assault, battery, and intentional infliction of emotional distress against the City of Chicago. Prior to trial, Barber voluntarily dismissed all but the assault claim against the City, and after the close of plaintiff's evidence the district court granted the defendants' motion for judgment as a matter of law on the assault claim, *see* Fed. R. Civ. P. 50(a). The federal claims went to a jury, which returned a verdict for Malaniuk and Shields. The district court denied Barber's subsequent motion for a new trial, Fed. R. Civ. P. 59(a). *See Barber v. Malaniuk*, No. 08–CV–6363, 2012 WL 8303336 (N.D. Ill. June 8, 2012).

Barber appeals the denial of his motion for a new trial, asserting six points of trial error. He contends that the district court erred (1) in allowing him to be cross-examined about his subsequent arrest for underage drinking; (2) in allowing him to be cross-examined about the fact of his prior conviction and resulting prison term; (3) in prohibiting him from impeaching Malaniuk and Shields with several of their prior inconsistent statements; (4) in prohibiting him from introducing several of his own prior consistent statements; (5) in admonishing one of his trial attorneys not to interrupt a witness's answer to lodge an objection during the defendants' cross-examination; and (6) in demonstrating bias in favor of the defendants. We review the denial of a motion for a new trial for an abuse of discretion. *Whitehead v. Bond*, 680 F.3d 919, 927 (7th Cir. 2012).

## II

We first tackle Barber's contentions that the district judge erred in permitting cross-examination about his arrest for underage drinking and about his felony conviction for possession of a stolen motor vehicle. A district court's evidentiary rulings, including those regarding the scope of cross-examination, are reviewed for an abuse of discretion. *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013); *Cruz v. Safford*, 579 F.3d 840, 844–45 (7th Cir. 2009).

## A

During trial, Barber testified on direct examination that he had not been drinking on the day of the incident. On cross-examination, defense counsel and Barber had the following exchange:

Q:     Do you drink at all, sir?

A:     No, sir.

Q:     You don't drink, period?

A:     Period, at all.

At sidebar, defense counsel argued that Barber's denial of drinking was "another lie and he's trifling with the Court," informing the district judge that Barber subsequently had been arrested in 2009 at Marshall Field Gardens for underage drinking and requesting that the defense be permitted to question Barber about that arrest. The judge acknowledged that an arrest for underage drinking does not suggest a character for untruthfulness, and so the arrest could not come in under Rule 608(b) of the Federal Rules of Evidence. Never-

theless, he ruled that the defense could impeach Barber with the subsequent arrest to contradict his testimony that he never drinks. The judge reasoned that, in light of Barber's denial of drinking, a subsequent arrest for underage drinking "certainly would be probative to whether or not he was drunk on the night in question," and he found that the probative value was not substantially outweighed by the risk of unfair prejudice. Later, in his order denying Barber's motion for a new trial, the judge gave a somewhat different explanation, namely, that the arrest evidence was admissible under Rule 608(b) as a specific instance of conduct to shed light on Barber's character for untruthfulness. 2012 WL 8303336, at *4–6.

Defense counsel asked Barber if he subsequently had been arrested for underage drinking in the same area. Barber testified that he had been arrested and charged with underage drinking but denied that he had been drinking; he explained that he had been standing with a group of friends and that the police arrested and charged everyone who was there. Defense counsel then moved to admit the arrest record, but the district judge sustained Barber's objection. The judge then instructed the jury as follows: "Ladies and gentleman, that testimony a few moments ago about [the arrest for underage drinking], I instruct you that you may consider this testimony of Mr. Barber only for the purposes of determining the character of Terrence Barber for truthfulness or untruthfulness and not for any other reason."

Barber argues that the district court abused its discretion in allowing cross-examination about the arrest because that arrest was not probative of truthfulness and did "not impeach [his] testimony [that] he did not drink." The defendants argue that

questioning about the arrest was proper in light of Barber's broad denial of drinking.

The district judge and the parties appear to have confused the type of impeachment at issue here. In denying Barber's motion for a new trial, the district judge explicitly ruled that the cross-examination was permissible under Rule 608(b), which permits cross-examination (though not extrinsic evidence) regarding specific instances of prior conduct that did not result in conviction but are probative of the witness's character (or propensity) for untruthfulness. But what the defendants were attempting with this cross-examination was not so much to show that Barber was probably lying because he had lied in the past, but to contradict his testimony that he does not drink. *See Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 604 (7th Cir. 1985) ("Impeachment by contradiction simply involves presenting evidence that part or all of a witness' testimony is incorrect."). Impeachment by contradiction differs from attacking a witness's character for veracity with specific instances of conduct and is not governed by Rule 608(b). *See United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir. 1996); *United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995). But we need not undertake a comprehensive comparison of these two methods of impeachment here, for it is clear that under either theory the district court abused its discretion in permitting this line of questioning.

The well-established, general rule is that a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges. *See Michelson v. United States*, 335 U.S. 469, 482 (1948) (dicta) ("Arrest without more

does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty."); *accord Thompson v. City of Chicago*, Nos. 10–2951 & 11–2883, 2013 WL 3455502, at *12 (7th Cir. July 10, 2013); *Cruz*, 579 F.3d at 845; *United States v. Lashmett*, 965 F.2d 179, 184 (7th Cir. 1992); *United States v. Bolden*, 355 F.2d 453, 457 (7th Cir. 1965). *But cf.* Fed. R. Evid. 609 (permitting impeachment with prior *convictions*, subject to certain limitations). "'This rule is based upon a clear recognition of the fact that the probative value of such evidence is so overwhelmingly outweighed by its inevitable tendency to inflame and prejudice the jury against the [party-witness] that total and complete exclusion is required in order that the right to trial by a fair and impartial jury may not be impaired.'" *United States v. Dilts*, 501 F.2d 531, 535 n.14 (7th Cir. 1974) (quoting *United States v. Pennix*, 313 F.2d 524, 529 (4th Cir. 1963)). Another reason for prohibiting impeachment with evidence of a prior arrest is that it is "easy and proper for the questioner to ask directly about the behavior [that led to the arrest] itself." 3 C.B. Mueller & L.C. Kirkpatrick, *Federal Evidence* § 6:33, at 219 (3d ed. 2007); *accord Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 626 n.7 (7th Cir. 2003).

Barber testified on cross-examination that he does not drink. It may have been permissible to allow the defendants to follow-up with a question like, "haven't you consumed alcohol at Marshall Field Gardens on other occasions?" *See, e.g., United States v. Chevalier*, 1 F.3d 581, 583–84 (7th Cir. 1993) (defendant could be impeached in tax-fraud trial with *facts* surrounding severed bank-fraud counts). Such a question, however, would not have been permissible under Rule 608(b) because the rule

covers only specific instances of conduct bearing on a witness's character for veracity, and underage drinking is not probative of veracity. *See United States v. Manske*, 186 F.3d 770, 774–76 (7th Cir. 1999); *cf. United States v. Spano*, 421 F.3d 599, 606 (7th Cir. 2005) ("It is improper to impeach a witness by presenting evidence that he has engaged in criminal or otherwise illegal or socially reprobated behavior unless the evidence undermines the credibility of his testimony beyond whatever undermining would be accomplished just by besmirching the witness's character."). Such a question would have been a permissible form of impeachment by contradiction, but if Barber had denied drinking on other occasions (as he did when he explained the circumstances of the arrest) the defense would have been stuck with his answer. It could not have used extrinsic evidence to show that Barber had in fact been drinking on other occasions because whether he had done so is collateral to whether he was drinking on December 14, 2005, when he was arrested and sustained his facial injuries. *See United States v. Kozinski*, 16 F.3d 795, 806 (7th Cir. 1994) ("[O]ne may not contradict for the sake of contradiction; the evidence must have an independent purpose and an independent ground for admission."); *Taylor v. Nat'l R.R. Passenger Corp.*, 920 F.2d 1372, 1375 (7th Cir. 1990) ("The rule in this circuit is that 'a witness may not be impeached by contradiction as to collateral or irrelevant matters elicited on cross-examination.'" (quoting *Simmons*, 762 F.2d at 604)). And even if the matter could be deemed not to be collateral, the defense would have had to find some other extrinsic evidence aside from the fact of the arrest (e.g., a witness who had actually observed Barber drinking on other occasions) to contradict Barber's testimony,

as an arrest or accusation does not establish that the underlying conduct actually occurred, *Michelson*, 335 U.S. at 482. The fact that the defendants would have run into these hurdles by questioning Barber on the conduct underlying the arrest rather than the arrest itself makes it even clearer that it was an abuse of discretion to allow cross-examination on the arrest itself.

The defendants acknowledge the general prohibition on impeaching a witness with his or her prior arrests, but they stress that the relevant passage in *Michelson* was dicta and, citing a handful of cases, argue that allowing such impeachment may be appropriate where the witness makes sweeping denials about engaging in the type of conduct underlying a prior arrest. While *Michelson*'s explanation was dicta, it was dicta of the strongest kind, as it came from the Supreme Court and was firmly rooted in logic. Moreover, the cases cited by the defendants do not persuade us that the cross-examination of Barber was proper. The only decision from this court cited by the defendants, *Sanchez v. City of Chicago*, 700 F.3d 919, 931–32 (7th Cir. 2012), involved the admission of an arrest record to undermine a § 1983 plaintiff's claim for emotional-distress damages and has no bearing on the propriety of cross-examining Barber about his arrest.

The strongest support for the defendants' position comes from the Ninth Circuit. In *United States v. Castillo*, the court held that the defendant's "expansive and unequivocal denial of involvement with drugs on direct examination warranted the district court's decision to admit extrinsic evidence of the 1997 cocaine arrest as impeachment by contradiction." 181 F.3d 1129, 1134 (9th Cir. 2001). And in *United States v. Weicks*, the

court held that it was permissible to impeach the defendant with his prior arrests for being a felon in possession of a firearm after he had portrayed himself on cross-examination as someone who never possessed guns and avoided being around firearms. 362 F. App'x 844, 849–50 (9th Cir. 2010). The defendants also draw support from the Tenth Circuit. In *United States v. Erb*, 596 F.2d 412 (10th Cir. 1979), the defendant had testified on direct that he had last made methamphetamine fifteen months prior to the charged incident. The court held that it was permissible for the government to cross-examine the defendant about an arrest on similar charges occurring around the time of the charged incident, and that it was also permissible for the government to call a rebuttal witness to testify about the circumstances leading to the other arrest. *Id.* at 420.

These cases are not persuasive. *Castillo* failed to acknowledge *Michelson* or the numerous other cases prohibiting impeachment of a witness with an arrest. And *Weicks* relied solely on *Castillo*, while at the same time acknowledging that *Castillo* was inconsistent with *Michelson* and *United States v. Pennix*, 313 F.2d 524, 529 (4th Cir. 1963), which we quoted approvingly in *Dilts*, 501 F.2d at 535 n.14. As for *Erb*, the court focused almost exclusively on the rebuttal witness and addressed the arrest only in a cursory manner, failing to mention *Michelson*. Notably, since *Erb* the Tenth Circuit has held that a witness may not be impeached with an arrest, *see, e.g, United States v. Wilson*, 244 F.3d 1208, 1217–18 (10th Cir. 2001); *United States v. Pino*, 827 F.2d 1429, 1431 (10th Cir. 1987), and it is not alone, *see, e.g., Hafner v. Brown*, 983 F.2d 570, 576 (4th Cir. 1992); *Jordan v. Medley*, 711 F.2d 211, 218 (D.C. Cir. 1983) (Scalia, J.)

(dicta); *United States v. Dennis*, 625 F.2d 782, 798 (8th Cir. 1980); *United States v. Labarbera*, 581 F.2d 107, 108–09 (5th Cir. 1978).

It is true that in some circumstances it may be proper to impeach a witness with evidence of a prior arrest, for instance, to establish the witness's bias, *see United States v. Spencer*, 25 F.3d 1105, 1109 (D.C. Cir. 1994). But in this case the defense was permitted to question Barber about the arrest on the mistaken premise that the arrest for underage drinking established that he actually does drink. This was an abuse of discretion. *Cf. Labarbera*, 581 F.2d at 109 ("This driving under the influence arrest could not be used to either generally impeach defendant or to impeach defendant's specific statement that he did not drink.").

**B**

Barber's next contention is that the district judge abused his discretion in allowing the defense to bring up Barber's 2010 felony conviction for possession of a stolen motor vehicle ("PSMV") on the issue of damages. Immediately following the inquiry into Barber's 2009 arrest for underage drinking, the cross-examination turned to the issue of emotional distress. Earlier in the trial, defense counsel had cross-examined Barber's mother as follows:

> Q: Did [Barber] complain about being afraid of the police?
>
> A: Yes.
>
> Q: Did he complain about being afraid of the police until this very day?
>
> A: Yes.

Q:     And it was all because of this event, De-
       cember 14th of '05?

A:     Yes.

Q:     There weren't any other reasons he
       was afraid of the police?

A:     No.

Following up on the examination of Barber's mother,
defense counsel questioned Barber as follows:

Q:     Okay. Well, is it your testimony today
       that you suffer from emotional distress
       until this very day because of the arrest
       on December 14th, '05?

A:     Yes. It left me scared of the police.

Q:     It's made you afraid of the police?

A:     Them two officers right there, sir.

Q:     Okay. And it's made you afraid of the
       police generally?

A:     No. I have family members that are police
       officers, sir.

Q:     Okay. So it's made you afraid of these
       two particular police officers?

A:     Yes, sir.

       …

Q:      And you don't have any emotional dis-
        tress from any other interactions with law
        enforcement, right?

A:      No, sir.

At sidebar, the defense requested that it be allowed to
question Barber about his PSMV conviction on the basis that it
was a supervening cause of any emotional distress he was
suffering. Barber objected on grounds that it would be unfairly
prejudicial and that Barber had said he was afraid of the two
defendants, not police generally. The district judge overruled
Barber's objection. So defense counsel asked Barber about the
conviction, though inquiry was limited to whether Barber had
been convicted of an unrelated crime and had served a stint in
state prison; Barber responded in the affirmative. The judge
then instructed the jury that it may "consider this testimony
only for the limited purpose of determining the issue of
emotional distress and damages."

Barber contends that the district court abused its discretion
in permitting this line of questioning, for two reasons. First,
citing Rule 609, Barber contends that the district judge abused
his discretion because he did not consider credibility as a factor
in deciding to permit cross-examination on the conviction.
Second, Barber contends that the district judge abused his
discretion because the testimony at trial was that Barber was
afraid of the two defendants, not police generally.

As a threshold matter, the defendants contend that Barber
waived this issue by failing to develop it adequately on appeal.
It is true that Barber's argument, like the rest of his brief, leaves
much to be desired, but we think it squeaks by, as it is strik-

ingly similar to the argument presented to the district court in *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913–14 (7th Cir. 2011), which we found not to be waived. Like the argument in *Hernandez*, Barber's argument was sufficient to give the defendants adequate notice, which is clear in light of the defendants' five-page response addressing this point.

Barber's reliance on Rule 609 is misplaced because that rule governs the admissibility of a witness's prior convictions *only* for impeachment purposes. The district judge did not allow the defense to impeach Barber with his conviction, so Barber has no claim under Rule 609. As a general matter, the fact that evidence may be inadmissible for one purpose does not mean that it is inadmissible for all purposes. *See, e.g., Gora v. Costa*, 971 F.2d 1325, 1330–31 (7th Cir. 1992). The district judge permitted the defense to question Barber about his PSMV conviction and incarceration to rebut Barber's claim for emotional-distress damages, and "[t]he admissibility of such evidence for purposes other than impeachment is dictated by Rules 401 and 403 … ." *Id.* at 1331.

There arguably may be some connection between Barber's intervening PSMV conviction and incarceration and the issue of emotional-distress damages, but that connection is tenuous at best. In *Sanchez v. City of Chicago*, 700 F.3d 919 (7th Cir. 2012), the same district judge allowed the defendants to question the § 1983 plaintiff about his arrest history after he had testified on direct that he had suffered emotional distress from being falsely arrested and subjected to excessive force. We observed that "[r]easonable people might disagree as to the probative worth of Sanchez's arrest history." *Id.* at 931. The fact that

Sanchez had been arrested before (presumably without excessive force) did not undermine his claim of trauma stemming from an incident in which officers "manhandled" him, as there is "a material difference between being arrested and being subjected to excessive force in the course of that arrest." *Id.* But since Sanchez also sought to recover for emotional trauma from being falsely detained, his arrest history "arguably might have been relevant to the jury's assessment of any emotional distress he suffered as a result of the improper detention." *Id.* at 932. We did not, however, definitively determine whether the district judge had abused his discretion in permitting that evidence to come in because we concluded that Sanchez had not suffered any material prejudice. *Id.*

Like the plaintiff in *Sanchez*, Barber asserted claims of false arrest and excessive force and sought to recover emotional-distress damages. But unlike the *Sanchez* plaintiff, Barber explicitly testified that he was afraid of defendants Malaniuk and Shields, specifically, and he disavowed any fear of police generally. This makes the connection of his felony conviction and incarceration to his claimed emotional distress even more tenuous than the questionable connection in *Sanchez*. As we observed in *Sanchez*, there is a difference between being arrested with and without excessive force. Moreover, there is a difference between being falsely arrested on one occasion and being rightfully arrested (and rightfully convicted) on another occasion. It is possible for a person to be traumatized by being falsely hauled off to jail and incarcerated, while accepting responsibility for his other misdeeds that result in even longer, lawful incarceration. That is, a person may suffer emotional

distress from being falsely arrested and held for mere hours while suffering no or minimal emotional distress (or emotional distress of a different kind) after being rightfully arrested, convicted, and incarcerated.

Moreover, Barber did not claim a generally disabling long-term trauma. That is, he did not try to establish that everything rotten in his life stems from the emotional trauma he experienced as a result of the defendants' actions. Suppose Barber had testified that his emotional trauma had prevented him from fulfilling his dream of becoming a banker (or otherwise integrating into society). A logical response might have been: You are not a banker because you did not finish school, and you did not finish school because you were serving time in prison upon being convicted of a felony. Another reasonable response might have been: You are not a banker because you are a convicted felon, and banks generally do not hire felons with no apparent skills. Had Barber's claim for emotional-distress damages been cast in such a broad manner (in the hopes of obtaining a larger verdict), then the probative value of his intervening PSMV conviction and resulting incarceration would have been much greater. The larger the chunk of one's life that is claimed to have been negatively impacted by emotional distress, the more important it is to explore other events that may have contributed to the individual's loss.

But from the record before us it does not appear that Barber blamed the defendants for all of the misery in his life. Rather, he testified that he was afraid of the two defendants, albeit up to this day, and that he had felt embarrassed walking around with a battered face. During trial, the defendants made much of Barber's unsavory lifestyle, including that he had fathered

three children before his eighteenth birthday, had not gradu-
ated from high school, and had a sporadic work history. In
response, Barber's counsel made no attempt to link up Barber's
troubled life since the underlying incident to the emotional
trauma he allegedly suffered as a result of that incident. He
acknowledged that Barber was irresponsible and stressed to
the jury that Barber came from a different background, and he
asked the jury to look past that and consider only the events of
December 14, 2005. Indeed, after conceding that Barber did not
have "a stellar work history," counsel stressed that Barber was
not "claiming lost wages in this case" and that Barber's work
history had nothing to do with the underlying incident. And
when discussing damages during his closing argument,
Barber's counsel argued as follows: "You're allowed to award
damages for his pain and suffering and his emotional distress.
I'm not going to rehash his testimony about what he said about
his pain and suffering … . He's not saying–we're not saying
this is a major life-changing event for him and asking for
hundreds of thousands of dollars. He's a 14-year-old kid who
got a fairly bad blow to his face and got some stitches and cuts,
and we think damages should be appropriate to that and his
testimony. That's all we're saying." Barber's claim for
emotional-distress damages was limited to the terror he
experienced during and shortly after the incident and his
continued fear of the two defendants. It is thus difficult to see
the probative value of his intervening PSMV conviction and
resulting incarceration on the issue of emotional distress.

We think it clear that the risk of unfair prejudice substan-
tially outweighed the miniscule probative value of the convic-
tion on this issue. "Evidence is unfairly prejudicial where 'its

admission makes it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented.'" *Smith v. Hunt*, 707 F.3d 803, 810 (7th Cir. 2013) (quoting *Thompson v. City of Chicago*, 472 F.3d 444, 456–57 (7th Cir. 2006)). Presenting a § 1983 plaintiff's criminal history to the jury presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motives, such as a belief that bad people should not be permitted to recover from honorable police officers. *See Llaguno v. Mingey*, 763 F.2d 1560, 1570 (7th Cir. 1985) (en banc) (observing "that civil rights actions often pit unsympathetic plaintiffs—criminals, or members of the criminal class … —against the guardians of the community's safety, yet serve an essential deterrent function"), *abrogated on other grounds by County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *see also Gora*, 971 F.2d at 1331 (explaining that courts must be "careful to ensure that a civil rights plaintiff's criminal past is not used to unfairly prejudice him or her"). Moreover, unlike *Gora*, 971 F.2d at 1331, and *Cobige v. City of Chicago*, 651 F.3d 780, 784–85 (7th Cir. 2011), where emotional distress was a central theme of the respective plaintiff's cases, the issue of emotional-distress damages during Barber's trial was a very minor issue and was focused narrowly on Barber's feelings about Malaniuk and Shields in particular, not police in general. Barber's counsel did not harp on emotional distress in either his opening statement or his closing argument, and the testimony from Barber on direct examination was limited to the following:

> Q:    Did this incident cause you any emotional distress?

> A:    Yes. Yes.
>
> Q:    Can you describe that for the jury?
>
> A:    I was really embarrassed to like walk around [with my] face like that, and I was really like shocked that the police would really do something like that to me when I did nothing at all.

Any doubt that the risk of unfair prejudice substantially outweighed the minimal probative value of the conviction and incarceration on the issue of emotional-distress damages is extinguished by a simple comparison with the district judge's pretrial ruling barring the defense from using the conviction for impeachment purposes. The district judge ruled that the defense could not impeach Barber with the PSMV conviction under Rule 609(a)(1) because the risk of unfair prejudice substantially outweighed the probative value of the conviction for impeaching Barber's credibility. While he agreed to reconsider the motion to address defense counsel's (erroneous) argument that circuit precedent treats receipt of stolen property as a crime of dishonesty (which would deprive the judge of discretion to exclude the conviction for impeachment, *see* Fed. R. Evid. 609(a)(2); *United States v. Wilson*, 985 F.2d 348, 351 (7th Cir. 1993)), no final ruling was made, but the defense was not permitted to impeach Barber with the conviction. A felony conviction for possession of stolen property (or possession of a stolen motor vehicle) is not a crime of dishonesty per se, *United States v. Jackson*, 546 F.3d 801, 819 (7th Cir. 2008), but it is more probative of dishonesty than other crimes, like murder

or assault, *Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557, 1567 (7th Cir. 1990) (en banc) (per curiam). In other words, the district judge thought the risk of prejudice accompanying the conviction substantially outweighed its considerable probative value for impeachment. It defies reason to conclude that the balance is shifted toward admissibility when the risk of unfair prejudice remains the same but the probative value on the issue of damages is negligible.

Given the substantial risk of prejudice, the infinitesimal probative value of the evidence, and the fact that emotional distress was touched on briefly, it was an abuse of discretion to permit the defense to question Barber about his PSMV conviction and resulting incarceration to rebut his narrowly focused claim for emotional-distress damages. The district judge's view would seemingly permit any civil-rights plaintiff's criminal history to come in on the issue of emotional-distress damages, no matter how tenuous a connection the evidence has to the issue of damages or how central a role emotional distress plays during the plaintiff's case. This, of course, would be contrary to our prior statements instructing courts to proceed carefully when deciding to admit evidence of a § 1983 plaintiff's criminal past.

## C

So the district court abused its discretion in allowing the defense to cross-examine Barber about his 2009 arrest and his

PSMV conviction, but Barber is not entitled to a new trial if those errors were harmless, *see, e.g.*, *Jordan v. Binns*, 712 F.3d at 1137–38. An evidentiary error warrants a new trial "only if the error affects a substantial right of the party," Fed. R. Evid. 103(a); *see also* Fed. R. Civ. P. 61, which means that there is a significant chance that the error affected the jury's verdict, *Jordan v. Binns*, 712 F.3d at 1137; *3M v. Pribyl*, 259 F.3d 587, 599 (7th Cir. 2001). To make this determination, we examine the error in light of the entire record, and a new trial will be granted only if we are unable to say with fair assurance that the error did not substantially sway the jury. *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 761–65 (1946). "Where there are several errors, each of which is harmless in its own right, a new trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial." *Jordan v. Binns*, 712 F.3d at 1137 (citing *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012)).

After examining the record, we are unable to say with fair assurance that the erroneous questioning about the 2009 arrest and the PSMV conviction and incarceration did not substantially sway the jury. The trial boiled down essentially to a credibility contest between Barber and the two officers. This was particularly so with respect to whether Barber had been drinking on December 14, 2005, for the defendants both testified that Barber had told them that he had been drinking Martel all day, but Barber denied this (and the medical evidence did not indicate intoxication, but more on this later). And as the district judge observed, whether Barber had been drinking on that day was a central issue at trial: the defense claimed that Barber fell and injured himself because he was

intoxicated, whereas Barber claimed that he had not been drinking and instead was forcefully thrown into the holding cell by Officer Malaniuk. The jury was informed that Barber had subsequently been arrested for underage drinking under very similar circumstances (with a group of others at Marshall Field Gardens), which created a substantial risk that the jury would use it for impermissible propensity purposes. *Cf. United States v. Harding*, 525 F.2d 84, 89 (7th Cir. 1975) (Stevens, J.) (noting that the impermissible propensity "inference is largely a function of the degree of similarity between the earlier crime and the present charge").

Indeed, the limiting instruction given by the district judge likely urged the jury to draw the impermissible propensity inference. Barber denied that he had been drinking when he was arrested on December 14, 2005, and he then denied that he drinks generally (though he did not say he had never had a drink, as the question and answer were limited to the present tense). The district judge instructed the jury that the questioning on the subsequent arrest was to be used only for judging Barber's character for truthfulness. But, as explained above, neither underage drinking nor an arrest for underage drinking is probative of a witness's character for truthfulness. So what was the jury to do? The most likely scenario is that the jury viewed the evidence of the subsequent arrest as making it more likely that Barber had been drinking with a group of friends at Marshall Field Gardens on December 14, 2005. Barber had denied drinking then, and the jury may well have thought that this subsequent arrest for underage drinking under similar circumstances showed he was lying about the circumstances surrounding the December 14, 2005, arrest. But

that is not impeachment. That is propensity evidence. In other words, that he allegedly had been drinking at Marshall Field Gardens in 2009 made it more likely that he was doing the same in 2005.

The defendants emphasize that Barber explained that he had not been drinking when he was arrested in 2009, but this is no cure to permitting the improper questions in the first place. Indeed, the explanation further bolstered the propensity inference sought by the defense. During closing argument, the defense argued as follows: "He never—he doesn't drink, period, he doesn't drink, but, oops, yes, I was arrested again for minor drinking at the very same place a few years after this event. But again, you know, the other guys had the beer, I didn't have a thing. Oops!" In essence, the defense asked the jury to gauge the likelihood that a person would be wrongly accused under near-identical circumstances on two separate occasions. Thus, the fact that Barber explained the circumstances of the subsequent arrest did not cure the error in allowing questioning on that arrest in the first place.

Permitting the cross-examination of Barber on his 2009 arrest for underage drinking sufficiently harpooned Barber's case that a new trial is necessary, and allowing the questioning about the PSMV conviction to follow on the tails of that cross-examination put the nail in the coffin of Barber's case. The defendants contend that the erroneous questioning about the PSMV conviction could have had no impact on the jury because the district judge instructed the jury to consider the conviction only on the issue of damages. Since the jury did not find liability, the argument goes, it never had occasion to consider damages, and hence it never considered the convic-

tion. While it is true that there is a general presumption that juries follow their instructions, that presumption is not absolute. *See, e.g.*, *Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994); *United States v. Boroni*, 758 F.2d 222, 225 (7th Cir. 1985) ("An instruction will not always cure the damage caused by erroneously admitted evidence. A reviewing court must determine with fair assurance whether, in spite of the instruction, the verdict was substantially swayed by the error." (citations omitted)). At some point judicial presumptions must give way to commonsense, and the formulaic recitation of a pro forma limiting instruction may not suffice to cure an error as it may fail to instruct the jury meaningfully as to what it legitimately may do with the evidence. *See, e.g.*, *United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring) ("Telling juries not to infer from the defendant's criminal record that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom.").

The potential damage from allowing the jury to hear of Barber's conviction was two-fold. First, the jury may have drawn the improper propensity inference that Barber's conviction of a felony makes it more likely that he was in fact committing the lesser crime of disorderly conduct (not to mention underage drinking) on the date of the underlying incident. Second, it provided powerful ammunition to support a jury argument that Barber is a despicable human being who should not be permitted to recover from the angelic police officers being wrongfully sued. Here, it is true that defense counsel did not explicitly mention the conviction in his closing with regard to anything but emotional distress, but it was

mentioned several times and the prevailing theme throughout the argument was that Barber is a horrible person who should recover nothing from the valiant police officers. Indeed, much of defense counsel's closing consisted of a general character assassination. For instance, the defense argued to the jury that Barber "likely never graduated from grade school. He fathered his first child at 14, and now he's fathered two more by the time he's 17, and he still doesn't work. You can consider his background, and they do not conform to acceptable behavior." Defense counsel also argued, "What's been proved, really, is that you have a sad instance where there is a pathological and cross-generational dysfunction in that Barber house. And that's a sad fact. And as mothers you can feel sorry for him, but you don't reward that dysfunction. That's quite an irony in these topsy-turvy times, that it's your job now to serve and protect these two fine men for doing an unpleasant task." While the defense may not have expressly mentioned the conviction in making these arguments, it did not need to do so to get its point across. The sting of the PSMV conviction was carefully folded into the pastry of bad behavior that the defense served to the jury.

The defendants also claim that there was overwhelming other evidence to cast doubt on Barber's credibility and his story in general. They point to numerous discrepancies between Barber's deposition testimony and his trial testi-mony—for example, he could not remember how long he was waiting outside for his mother before the police arrived and could not remember all of the details of his visit to the hospital—but most (if not all) of these discrepancies can be attributed to the passage of time between the incident and trial,

which was almost six years, and Barber's inexperience as a witness. Indeed, when Officer Shields and Officer Malaniuk (both of whom testified that they had served as witnesses hundreds of times) could not recall details, the passage of time was emphasized as the reason for their memory lapses. The defendants also claim that Barber's testimony that a female officer helped him clean himself up after he was injured is patently absurd because the officer would have been acting contrary to protocol and placing herself in grave danger. But it does not strike us as so incredibly unbelievable that a police officer who happens upon an injured and bleeding child (Barber was 14, was 5'1" tall, and weighed approximately 120 pounds) would ignore protocol and offer a helping hand. There may be other holes in Barber's case, but the fact that there may be other reasons for not believing Barber's story does not necessarily mean that the improper questioning was harmless. *See, e.g.*, *Taylor*, 920 F.2d at 1377.

We also observe that the defendants' story was not iron-clad. Most importantly, they testified that Barber was a little intoxicated and was not falling-down drunk, while at the same time testifying that he was injured because he was so intoxicated he fell down. It seems that falling down and injuring oneself due to one's intoxicated state is the very definition of "falling-down drunk," but the defendants went to great lengths to deny that Barber was falling-down drunk. Why? Perhaps this was because the medical records did not mention anything about Barber being drunk, something the treating physician testified he would have noted with a 14-year-old patient. It is true that Barber was injured around 8 p.m. and not taken to the hospital until 10 p.m., but it may strike a jury as

odd that a 14-year-old child who allegedly had been drinking liquor all day long would be unable to walk steadily at 8 p.m. and then sober up to the point that he had no indicia of intoxication a few hours later. In short, this was *not* a one-sided case, and we cannot say with fair assurance that the improper questioning on Barber's subsequent underage drinking arrest and PSMV conviction did not substantially sway the jury.

### III

Given our resolution of Barber's first two claims of error, we need not address his remaining contentions. Pursuant to Circuit Rule 36, Barber's new trial will be assigned to a different district judge (absent consent of the parties), who can revisit the rulings in limine. We note, however, that Barber's claims of judicial bias are utterly meritless and are not well taken. *Cf. Liteky v. United States*, 510 U.S. 540, 555–56 (1994).

The district court's denial of Barber's motion for a new trial is REVERSED, the judgment is VACATED, and the case is REMANDED for a new trial.