**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12603

————————————

KENNY FAULK,

*Plaintiff-Appellee,*

*versus*

DIMERCO EXPRESS USA CORP.,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-01850-MLB

————————————

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and
CONWAY,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a lawyer's misconduct and alleged errors by the district court in admitting evidence

require a new trial and whether awards of compensatory and punitive damages were excessive. Dimerco Express USA, a transportation company, conditionally hired Kenny Faulk for an Atlanta sales job, but withdrew his offer when the president of Dimerco discovered Faulk was black. Faulk sued Dimerco for racial discrimination. *See* 42 U.S.C. § 1981. A jury awarded Faulk $390,000 in damages for lost wages and emotional distress, and $3 million in punitive damages. Dimerco moved the district court for a new trial based on the misconduct of Faulk's counsel and evidentiary rulings by the district court. Alternatively, Dimerco asked the district court to remit the compensatory damages and to reduce the punitive damages. The district court denied Dimerco's motions. Because the district court cured the lawyer's misconduct and did not reversibly err in its evidentiary rulings, we affirm its denial of a new trial. Because the compensatory damages were supported by the evidence, we also affirm the denial of remittitur. And because the punitive damages are not unconstitutionally excessive for Dimerco's reprehensible conduct, we affirm the denial of the motion to reduce them.

## I. BACKGROUND

We view "the facts in the light most favorable to the jury's verdict." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288,

---

* The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

1295 (11th Cir. 2021). We first recount those facts before describing the proceedings in the district court.

### A. Dimerco's Discrimination Against Faulk

Dimerco Express Group is a multinational transportation company with several onshore offices, including one in Atlanta. It is based in Taiwan, and the defendant is its United States subsidiary, Dimerco Express USA. We refer to the defendant subsidiary as Dimerco.

In March 2018, the founder of the parent company, Paul Chien, met with Herbert Liou in Los Angeles while interviewing him for the presidency of Dimerco. At Chien's request, Liou submitted a management plan to Chien and requested feedback. Although Dimerco purported to have a race-neutral hiring policy, one of Liou's proposals was "[h]iring Caucasian Sales & Marketing Manager/VP in LAX/NYC respectively." Another item suggested "leveraging Caucasian Sales & Marketing Manager/VP . . . to assist local office." At trial, Liou explained that Dimerco needed "Caucasian" managers to "attract the Caucasian market." Chien promoted Liou to president of Dimerco.

Renee Howard worked as human resources manager for Dimerco. She recruited for several locations, including the Atlanta office. Liou requested that she assist in recruiting account executives—the title for salesmen. Branch managers were the primary

hiring managers for their own locations, but when a branch manager decided to extend a job offer, Liou would "review the offer" before Dimerco would contact the applicant.

Howard noticed that Liou rejected any non-white applicant she submitted to him. Liou told her that he preferred to hire white applicants because "it is easier to get a Caucasian person through the door to obtain sales . . . than it was any other race." Howard was uncomfortable with the practice and spoke to her manager, Anthony Tien, about the racially discriminatory policy in June 2019. Tien told her that Liou had decided that Dimerco could only hire "white Caucasi[a]n[s]"—preferably men under 40—as account executives. In October, Howard presented a PowerPoint to her human resources team stating that "Ideal Sales Candidates" would be "American and Caucasian (preferred) ethnicity." She attributed this view to Liou, who told her that his preference was "Caucasian, young, white men" because "they were . . . work horses."

Kenny Faulk, a black man, possesses bachelor's and master's degrees in business administration. Immediately before applying to Dimerco, he worked for Livingston International as a trade management executive. In July 2019, he was arrested for rape, battery, and aggravated assault. He did not tell his employer about his arrest and was fired because he failed to report to work. After retaining counsel, he sent a demand letter to Livingston, which falsely attributed his absence to sickness and his mother's health.

In August 2019, he applied to the Atlanta office of Dimerco for a position as an account executive. Howard and Sookie Song,

the Atlanta branch manager, offered Faulk the job with a salary of $90,000, conditioned on his successful competition of a background check. They were unaware of Faulk's arrest or his firing by Livingston, because Faulk misrepresented that he was still employed there.

Dimerco's background check revealed that Faulk had been found guilty of misdemeanor disorderly conduct in 2014. Dimerco also received a Fulton County docket report about Faulk's conviction, which showed that the conviction was reduced from a charge of aggravated assault. Song became concerned that hiring Faulk might risk the safety of the office and clientele. She emailed Howard, with Liou copied, a screenshot of the report of the disorderly conduct charge and wrote, "I [am] not sure what we need to do?" The screenshot also identified Faulk as "Black." Liou directed Howard to rescind the offer.

On September 27, 2019, Howard emailed Faulk to tell him the offer was being rescinded. To this email Howard attached the background check which, she noted, contained "information" that "caused [Dimerco] to rescind the offering of employment." The email suggested that Faulk "contact" Dimerco if any information in the report was inaccurate or if he wanted clarification. Faulk spoke with Howard on the phone and told her that the disorderly conduct conviction arose from "a verbal disagreement with [his] ex-wife," but Howard told him there was nothing he could do.

In November 2019 the Dallas office of Dimerco hired Tanner Thibobeaux, a white man, as an account executive. Howard

screened Thibobeaux and sent him to the Dallas branch manager, Eric Tsai. A background check revealed that Thibobeaux had four misdemeanor convictions stemming from one incident in 2013. When the report came back, Howard called Thibobeaux and allowed him to explain the situation, which he later did by email. Liou approved hiring him, and Thibobeaux worked for Dimerco for about two years. Howard asked Liou why Dimerco would hire someone with a more significant record than Faulk. Liou responded that he wanted to hire only whites.

In January 2020, Howard emailed Liou insisting that "it's discriminating to search for [a] candidate based on race." Liou forwarded the email to the director of administration and compliance, Cathy Chou. He attached a proposed response that Dimerco "is focusing on [the] Caucasian Market." Chou responded to Liou that "[i]f [you] put[] in writing that you want a specific race . . . , [b]oth you and the company are guilty of discrimination and if we ever get a legal complaint, these emails will result in a guilty verdict and large damage award." Chou limited her advice to "strongly suggest[ing] [Liou] reword the message." Howard resigned in March.

In June 2020, Howard contacted Faulk on LinkedIn. They did not discuss Dimerco until April 2021, when Howard told him that "shortly after they rescind[ed] your offer, they hired a white man with a record . . . [and] the president didn't want to hire any

other race." They later spoke by phone and discussed the possibility of suing Dimerco.

### B. Proceedings in the District Court

In 2021, Faulk sued Dimerco for racial discrimination. *See* 42 U.S.C. § 1981. He sought compensatory damages for lost wages and emotional distress, and he requested punitive damages.

Before trial, Faulk moved to exclude the record of his 2019 arrest for rape. Dimerco sought to introduce the arrest record to impeach Faulk's character for truthfulness and to dispute his claim of emotional distress. Faulk argued that the arrest record was irrelevant and that any relevance was outweighed by its undue prejudice. Faulk cited *Barber v. City of Chicago*, 725 F.3d 702 (7th Cir. 2013), which reversed a decision to admit a civil rights plaintiff's arrest record.

The district court denied Faulk's motion. It ruled that the arrest was relevant "to [Faulk's] claim for compensatory damages, particularly his request for emotional distress damages." The arrest "provide[d] context" for his allegations that he suffered emotional distress after learning of Dimerco's failure to hire him. The district court also concluded that *Barber* was inapposite because there was no reason to believe Faulk "will somehow limit his claim for emotional distress as the plaintiff did in *Barber*." If he did, "the Court w[ould] revisit the issue."

At a pre-trial conference, the parties discussed Faulk's 2014 conviction for disorderly conduct. Dimerco wanted to produce the

Fulton County record showing that the original charge was aggravated assault. The district court ruled that because Dimerco stated that it relied on that document, the record could be admitted.

At the start of the trial, the district court instructed the jury that "lawyers' statements and arguments are not evidence." But misconduct started early. Faulk's counsel, Amanda Farahany, told the jury in her opening statement that her client took up a "torch" against "injustice" to "hand it over to you":

> You're also going to hear from [Faulk] about why he brought this case. About why it was so important for him to stand up against this injustice. *Why he took the torch from [Howard], who gave up, to be able to hand it over to you.* And he's going to tell you how hard it is to fight against corporate power. And you're going to hear what I mean by that.

The district court immediately admonished Farahany in the presence of the jury: "I'm going to ask you not to argue about passing a torch to the jury. That's not appropriate argument." After sending the jury out of the courtroom, the district court reiterated, "Faulk is not passing the torch to teammates on the jury. . . . Faulk is presenting his case to an impartial jury, who ought to be asked to follow the law impartially." Farahany asked if the language was

only "inappropriate for opening" or if it was inappropriate for closing too. The district court told her it was inappropriate for both and that it "d[id not] want to confuse" the jurors as to their role.

Howard testified about her role in hiring Faulk and Thibobeaux. Chou testified that Dimerco's "marketing strategy" was to pair customers to salesmen based on race. She explained that if she had a Chinese customer "shipping Ginseng," Dimerco would want a Chinese salesperson because "[o]nly Chinese know[] Ginseng." Black people "don't know about . . . ginseng." Chou attributed the selection of the salesmen with whom she interacted to this strategy and stated that other companies "send out" salesmen with "oriental face[s]," and that "sometimes they even . . . have a Chinese [person] . . . come out to talk to [her]." Liou testified that he wanted "Caucasian sales" executives to "attract the Caucasian market." He also admitted that it was "possible" he knew Faulk was black if he had "pa[id] attention" to his email.

At the end of the second day of trial, the district court discussed Faulk's 2019 arrest record with counsel. It told them again that Faulk's arrest could be relevant to his emotional distress. The district court reaffirmed that "this is an in court decision based upon the testimony."

Faulk described his employment history and his attempt to get a job with Dimerco. He described what it was like to have the offer rescinded and that, although he "felt like [he] could do th[e] job," he "just moved on." He also testified about how the death of George Floyd affected him and said that he had "been in situations

where [he] almost got killed" and that Floyd's death "br[ought] back memories." He clarified that he was not seeking compensation for anything that happened before he learned about Dimerco's discrimination against him in April 2021.

Faulk discussed his feelings after learning from Howard about Dimerco's discriminatory practices. He said that he was "upset" and "angry" and "really mad." He described his frustration that, despite being "the best candidate and the person for the position," Dimerco "wast[ed his] time" because "they kn[e]w all along they're not going to hire [him]." It caused him to wonder why he had gone to college for years, "getting [his] bachelor's and [his] master's for what?" Faulk told the jury that "this was like the worst thing. . . . [I]t's just bad. . . . I've worked so hard for this opportunity." Faulk later stated that learning of Dimerco's discrimination against him had "just been the hardest—I mean, it's been the hardest thing for me."

During a later break, the district court reversed its position on admission of the 2019 arrest record. It explained that Faulk "has limited his claim of emotional distress . . . fairly clearly to a timeframe that began when he had a pretty clarifying moment that he had been . . . discriminated against." It stated that he had limited his emotional distress claim "to a feeling of discrimination," and that he hadn't "described any greater general malaise or angst or

emotional pain that could be attributed to the rape allegation." Because Faulk "has cuddled up within *Barber* very safely," the district court excluded the arrest record.

Dimerco called Tsai to testify about his hiring of Thibobeaux. Dimerco next called Song and asked her if she considered any materials other than the background check in Faulk's hiring. Song explained that she had received a report from Chou but could not remember "what kind of report [it] was." Farahany objected, in front of the jury, that Dimerco had not produced the document to which Song referred. The district court sent the jury out and rebuked Farahany for arguing in front of the jury. In responding to the objection, Dimerco explained that it planned to introduce the 2014 arrest record that had previously been admitted before trial. The district court reversed course and excluded the record because "it ha[d] a lot of other stuff." The district court allowed Song to testify "that [Dimerco] had other information that [it] considered." Song told the jury that after receiving the background check listing Faulk's 2014 conviction, she learned that Faulk had been initially charged with "aggravated assault."

On cross-examination, Song clarified that the aggravated assault charge was the "main reason" she declined to hire Faulk. Farahany asked Song if she did "additional digging into . . . Faulk's background." Song said no. Then Farahany asked, "And you have not produced here any place where you're showing that you've gotten another piece of information, right, your lawyer hasn't put it in to

show that other than the [background check] report, that you received something else, correct?" Dimerco's counsel objected in front of the jury, saying, "It has to do with a ruling. I didn't put it in."

The district court told both attorneys "we're not going to talk like that in front of the jury. We're going to remind the jury that the only thing that's in evidence is the evidence." But the district court did "sustain the objection for a different reason," because Farahany was "asking a witness to comment on evidence." The district court instructed the jury to "disregard any summary you heard about what is or is not in evidence" because "[c]ounsel will have an opportunity to make those arguments in closing."

After Song's testimony, both sides rested. Dimerco then moved for judgment as a matter of law. The district court denied the motion. It explained that the jury could hold Dimerco liable based on the internal emails it had seen and Howard's and Chou's testimony.

In closing argument, when Farahany opened with an excursus on the importance of the jury system, the district court instructed her to "move on from those types of arguments." It told her that "[w]e're talking about the evidence in this case." It reminded her that it "ha[d] told [her] how to behave in this case," and that she "ha[s] to follow [its] instructions and only [its] instructions." In her rebuttal, Farahany told the jury that Faulk "carried the mantle, and he brought it from [Howard] to him. And he picked it up. And he brought it here so that he could come all the

way to this courtroom and to bring it and to turn it over to you." Dimerco objected, and the district court ruled that it was "going to strike that last statement."

After the jury was dismissed and Dimerco objected again to Farahany's comments about the mantle, the district court asked Farahany if she recalled "what [it] said after [her] opening" about her torch comments. Farahany suggested that "there's a difference when [she is] handing it to the jury." The district court disagreed and told her that it "cannot imagine why [she] would argue that in the light of what [it] told [her]." Farahany insisted that there was a difference between a torch and a mantle. The district court disagreed and insisted that it "gave [her] an instruction," and that she "knew that instruction," but "ran right through it." And the district court told her that even if she disagreed with it, her avenue was "to go to the Eleventh Circuit," not to "disregard what [it] say[s] and to change words or diction to get the same exact concept." Farahany insisted that she "used very specific words in order to not pass the mantle onto them." The district court responded, "Survey says wrong. . . . I don't know what else to do."

Dimerco asked for a curative instruction. The district court declined because "the jury got from [Dimerco's] objection and [its] sustaining the point that it wasn't okay." And it decided that "to do anything more at this point in the case would be improper and could prejudice the plaintiff." Frustrated, the district court added that "for about the fifth time," it was "going to allow . . . Farahany

to disregard [its] instructions, to act inappropriately, with zero ramifications . . . just rewarding bad behavior." The district court expressed its bewilderment at Farahany's conduct, especially the several times she had "argu[ed] back with [it] in front of the jury."

After the jury retired to deliberate, the district court told counsel it had "spent a fair amount of time . . . thinking about . . . a mistrial" on its own initiative. But it concluded that it was not "a close call on a mistrial." Although the mantle comment was egregious, "it was one comment." And "[o]ther than that . . . the argument was fair." And the other misconduct was "largely . . . away from the jury." The district court concluded that "this jury has a fair view of the evidence," and it elected not to declare a mistrial.

When Farahany suggested that the district court had treated her unfairly, the district court responded that her misconduct was worse than anything it had seen from Dimerco's counsel. It explained that she had "stood up" when Faulk was testifying and that it saw her "smiling at [her] client, nodding with [her] client, and making other facial expressions" while he was testifying. Although the district court said nothing about it at the time, the conduct was "inappropriate," and "the jury saw it."

The jury returned a verdict for Faulk. It found that Dimerco had refused to hire Faulk because of his race. It awarded Faulk $90,000 in lost wages, $150,000 in compensation for past emotional

distress, $150,000 in compensation for future emotional distress, and $3 million in punitive damages.

Dimerco moved for a new trial or for remittitur of the damages award. It argued that a combination of Farahany's misconduct and alleged evidentiary errors required a new trial. In the alternative, Dimerco asked for remittitur of the emotional distress and punitive damages awards because they were excessive and the "product of prejudice and passion aroused by [Faulk]'s counsel's misconduct."

The district court denied Dimerco's motions. It rejected the argument that Farahany's misconduct required a new trial because it did not "agree that her comments had any impact on the jury." And it had issued instructions that would cure any prejudice. The district court also rejected Dimerco's evidentiary arguments. It reaffirmed its exclusion of the 2019 arrest record because Faulk's emotional distress testimony was "limited" to when he learned about Dimerco's discrimination. Because the district court found no "error based on the grounds asserted by" Dimerco, it found no cumulative error. The district court also rejected Dimerco's motion to remit the damages award. It ruled that the compensatory damages award was not excessive in the light of the credibility of Faulk's testimony and other damages awards in similar cases.

The district court declined to disturb the punitive damages award. It explained that Dimerco's request for a reduction of the punitive damages was "not really a remittitur at all" because the district court could enter judgment for the correct amount. It ruled

that the relevant factors favored Faulk because of the reprehensibility of Dimerco's conduct. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). The: 7.69 to 1 punitive to compensatory damages ratio was not "[un]constitutionally excessive" "[g]iven the extreme conduct at issue." And it granted Faulk's motion for fees and costs, awarding him $406,238.78.

## II. STANDARDS OF REVIEW

We review several issues for abuse of discretion. "We review for abuse of discretion the denial of a motion for a new trial," *Thomas v. Broward Cnty. Sheriff's Off.*, 71 F.4th 1305, 1311 (11th Cir. 2023), the evidentiary decisions, *United States v. Brown*, 415 F.3d 1257, 1264–65 (11th Cir. 2005), and the denial of a motion for remittitur. *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1204 (11th Cir. 2020). We also "review the award of attorneys' fees for abuse of discretion." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1351 (11th Cir. 2008).

We review *de novo* the constitutionality of a punitive damages award, but we "defer to the district court's findings of fact unless clearly erroneous." *Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 846 (11th Cir. 2021).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that neither counsel's misconduct nor the evidentiary rulings, nor their combination, requires a new trial. Second, we explain that the district court did not abuse its discretion in declining to remit the compensatory damages award. Third, we explain that the punitive

damages award was not unconstitutionally excessive. Fourth, we explain that the district court did not abuse its discretion in awarding Faulk attorney's fees.

*A. The District Court Did Not Abuse Its Discretion in Declining to Order a New Trial.*

Dimerco argues that misconduct by Faulk's counsel, erroneous evidentiary rulings by the district court, and the cumulative errors of both, warrant a new trial. We conclude that the district court did not abuse its discretion in denying a new trial.

1. Counsel's Misconduct Does Not Require a New Trial.

A lawyer's misconduct warrants a new trial only when it "impair[s] a substantial right of the objecting party." *Ruiz v. Wing*, 991 F.3d 1130, 1141 (11th Cir. 2021) (citation and internal quotation marks omitted). "[I]nappropriate statements made by counsel will not justify a new trial unless the remarks were such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Id.* (citation and internal quotation marks omitted).

Dimerco complains of three categories of misconduct: Farahany's attempts to "enlist the jurors as Faulk's teammates" in her opening and closing statements, her "improper cross-examination of . . . Song," and her "other improper trial tactics." It argues that the district court abused its discretion by "permitting Faulk's counsel to engage in pervasive misconduct . . . without issuing curative instructions to mitigate the harm." And it contends the jury's verdict and damages award show that the tactics "were so prejudicial

and inflammatory they tainted the proceedings." We disagree on all points.

### a. Counsel's Misconduct in Her Opening Statement and Closing Argument Does Not Require a New Trial.

Farahany's comments in opening and closing were improper, but they do not require a new trial. Immediately before the closing arguments, the district court instructed the jury that it "must not be influenced in any way by either sympathy for or prejudice against either party," and that its "only interest is to seek the truth from the evidence in the case." And when Farahany made the improper arguments, the district court corrected her immediately in front of the jury. The district court stopped Farahany in the middle of her opening statement and told her and the jury that "[t]hat's not appropriate argument." And it sustained Dimerco's objection to her inappropriate closing argument and struck it from the record. We "always presume that a jury follows its instructions," *United States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021), and we have no reason to think that the jury disregarded its instructions here.

Dimerco argues that the district court abused its discretion by declining to issue a curative instruction after Farahany's misconduct in closing. But Dimerco never explains why another curative instruction was necessary when the district court immediately corrected the argument in front of the jury. It relies on our decision in *Allstate Insurance Company v. James*, where plaintiff's counsel argued in closing that the jury could "do something" about the price of

insurance by deciding in the plaintiff's favor. 845 F.2d 315, 319 (11th Cir. 1988). There the district court overruled the objection and "refus[ed] to instruct the jury" that it was not to consider the policy impacts of its decision. *Id.* In doing so, the district court communicated "a certain approval" of the improper argument. *Id.* And the evidence "d[id] not so overwhelmingly weigh in favor" of the plaintiff that we could conclude that "the remarks were harmless." *Id.* at 320. *James* has little in common with Dimerco's case, where the district court instructed the jury not to consider the remarks immediately after they were delivered. That fact also distinguishes Dimerco's persuasive authorities, which both involved prosecutorial misconduct to which neither defense counsel nor the district court objected. *See e.g.*, *United States v. Canty*, 37 F.4th 775, 792 (1st Cir. 2022); *United States v. Sanchez*, 659 F.3d 1252, 1256 (9th Cir. 2011).

Dimerco argues that the district court abused its discretion by allowing Farahany to inflame the jury "without consequence." It argues that we have "condemned defying court rulings." Although correcting Farahany's defiance of the court may "vindicate the authority of the court," to win a new trial, Dimerco must prove that Farahany's misconduct affected its "substantial rights." *Christopher v. Florida*, 449 F.3d 1360, 1367 (11th Cir. 2006) (emphasis omitted). Yet Dimerco was not prejudiced by an argument immediately corrected by the district court.

Dimerco's remaining arguments fare no better. First, Dimerco points to the district court's *sua sponte* decision to consider ordering a mistrial. But it ignores the district court's conclusion

that a mistrial order was not a "close call." Second, Dimerco points to what it calls a "contradiction" in how the district court described the severity of Farahany's comments. Although the district court referred to the "egregiousness" of Farahany's conduct, it did so based on her flouting of its instructions, not the effect of her arguments on the jury. Finally, Dimerco points to the fact that the misconduct occurred in rebuttal, after it could no longer respond to Farahany's description of the case. But Dimerco *did* respond by objecting to her statement. The jury was already on notice of its role from its instructions. And those instructions were reinforced by sustaining Dimerco's objection and striking Farahany's statement from the record.

### b. Counsel's Improper Cross-Examination of Song Does Not Require a New Trial.

Farahany's singular question to Song about the excluded 2014 arrest record, while improper, does not require a new trial. As the district court stated, Farahany "misled the jurors" by asking a "totally unfair" question. But the district court immediately issued a curative instruction to "disregard any summary you heard about what is or is not in evidence." Because we presume that the jury follows its instructions, *Colston*, 4 F.4th at 1192, we conclude that Farahany's question did not prejudice Dimerco. Dimerco suggests that this instruction was insufficient. But its alternative is for the district court to tell the jury that Farahany's question "was false and should be disregarded." Either way, the jury would be instructed to disregard the question. Assuming as we must that the jury did so,

the reason it was instructed to disregard the question cannot possibly matter.

Nor did the question leave the jury with the "misleading narrative" that the 2014 arrest record did not exist. Dimerco's immediate statement to the jury that the record existed went uncontradicted. And in closing, Faulk did not dispute that he was originally charged with aggravated assault; he disputed that the charge reflected his conduct. Indeed, Faulk argued that he had impeached Dimerco. As Faulk explained, if Song's "main reason" not to hire Faulk was the aggravated assault charge, then Dimerco misrepresented its reasoning in its revocation letter, which attributed the revocation to Faulk's conviction for disorderly conduct.

Dimerco also objects to a different curative instruction. When Dimerco objected to Farahany's question, it stated before the jury that the 2014 arrest record did exist, but that it was only excluded from evidence because of a ruling. In response, the district court told the jury that "the only thing that's in evidence is the evidence." According to Dimerco, this separate instruction "reinforced the false impression" that Song had no reason to believe Faulk had committed an aggravated assault. But the jury heard Song's testimony that she relied on Faulk's arrest for aggravated assault, which it was instructed to consider as evidence. Farahany's question did not so prejudice Dimerco as to require a new trial.

c. Counsel's Other Misconduct Does Not Require a New Trial.

Farahany employed "forbidden trial tactics" the district court described as "coaching" Faulk. She guided him through

cross-examination using "facial expressions" and "speaking objections." But Dimerco did not object to this behavior during the trial, and the district court raised it *sua sponte* long after the offensive behavior. In addition, Farahany regularly "argu[ed] with the [district] court in front of the jury after evidentiary rulings."

Although Dimerco maintains that this behavior supports its request for a new trial, it cites no authority holding that these tactics, which may have offended the jurors, require a new trial. We leave the decision to the discretion of the district court because it is in "the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Saget*, 991 F.2d 702, 707–08 (11th Cir. 1993) (citation and internal quotation marks omitted). The district court concluded that "the jury had a fair view of the evidence and was not impacted" by the misconduct. Knowing as little as we do about this misconduct, we cannot conclude that the district court abused its discretion.

2. The Evidentiary Rulings Do Not Require a New Trial.

Evidentiary errors require a new trial only "where the error has caused substantial prejudice to the affected party." *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 807 (11th Cir. 2017) (citation and internal quotation marks omitted). We ask, "[H]ow much of an effect did the improperly . . . excluded evidence have on the verdict?" *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004). Dimerco points to two exhibits it argues were erroneously excluded: the record of Faulk's 2019 arrest for rape and

the record of his 2014 arrest for aggravated assault. Neither exclusion warrants a new trial.

### a. The District Court Did Not Err in Excluding the 2019 Arrest Record.

Dimerco argues that the district court erred by not allowing it to use the pending charges from Faulk's 2019 arrest "as an alternative cause of his alleged emotional distress." The district court excluded the 2019 arrest record under Rule 403. That Rule allows the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." FED. R. EVID. 403.

The district court did not abuse its discretion in excluding the 2019 arrest record. It ruled that the arrest would be of limited probative value because Faulk's testimony was "limited" to his distress from learning in 2021 about Dimerco's discrimination against him. Faulk's testimony about his emotional distress was a credibility question: he did not point to any external evidence of emotional distress or testify to his general emotional state at the time he learned that he had been a victim of Dimerco's illegal practices. The district court, relying on its observation of Faulk's demeanor, concluded that nothing in his testimony "suggest[ed] that he experienced" a general malaise. Evidence of other distressing events was not relevant to the emotional distress Faulk attributed solely to Dimerco's discrimination.

Like the district court, we find *Barber* persuasive. *Barber* held that because a plaintiff's "claim for emotional-distress damages was

limited to the terror he experienced during and shortly after the incident" giving rise to his suit, a supervening conviction had "miniscule probative value." 725 F.3d at 714. In contrast, admitting evidence of the plaintiff's criminal history "presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motives." *Id*. The district court faced a nearly identical case: admission of Faulk's 2019 arrest record would engender a "substantial risk" that the jury would rule "based on emotion or outrage." The district court did not abuse its discretion in deciding that this risk "substantially outweighed" the probative value of the 2019 arrest record. FED. R. EVID. 403.

Dimerco contends that the district court erred by "erroneously applying and following the Seventh Circuit's *Barber* case instead of binding authority from this Circuit." It points to two of our opinions it contends require a different outcome: *Akouri v. Florida Department of Transportation*, 408 F.3d 1338 (11th Cir. 2005), and *Bryan v. Jones*, 519 F.2d 44 (5th Cir. 1975), *reversed on other ground on reh'g*, 530 F.2d 1210 (5th Cir. 1976) (en banc). It draws from *Akouri* the principle that emotional distress damages require an examination of "the degree of emotional distress, . . . the context of the events surrounding the emotional distress, [and] . . . the nexus between the challenged conduct and the emotional distress." 408 F.3d at 1345 n.5.

The language Dimerco quotes from *Akouri* comes from a Fourth Circuit opinion listing nine factors to consider in evaluating emotional distress awards, and we expressly declined to "apply

24-12603                Opinion of the Court                25

these factors" in *Akouri*. *Id*. We have not adopted that test in any published opinion.

Dimerco's reliance on *Bryan* fares no better. The panel confronted a claim of false imprisonment under 42 U.S.C. section 1983 for which the plaintiff sought emotional distress damages. *Bryan*, 519 F.2d at 44. The district court excluded evidence of the plaintiff's prior incarceration because he "sought damages only for mental suffering caused by the knowledge that he was wrongfully restrained with no apparent possibility of release." *Id*. at 46. The Fifth Circuit rejected this argument on the ground that the parties "should have been given an opportunity to develop all factual elements which related to damages." *Id*. Because "th[e] mental anguish" suffered by a recidivist may be much less than that suffered by someone "incarcerated for the first time[,] . . . prior imprisonment is a consideration to the extent of mental suffering occasioned by the wrongful confinement." *Id*. *Bryan* could be relevant if the evidence Dimerco sought to introduce showed that Faulk had previously experienced discrimination. But *Bryan* does not establish that a plaintiff's prior incarceration is always relevant to any future claim of emotional distress.

Dimerco points out that in *Barber* the extent of emotional distress damages "was a very minor issue and was focused narrowly on Barber's feelings" about two police officers. 725 F.3d at 714. In contrast, Faulk's emotional distress "was a theme of his case and his testimony," which reached "ongoing frustration, anger and sadness from perceived career derailment." But Faulk's discussion of

"career derailment" was limited to the racially motivated revocation of his offer by Dimerco—a motive he did not discover until more than a year after his 2019 arrest. Faulk did not testify to general dissatisfaction with the state of his career. Dimerco also argues that "it was impossible" for Faulk to "compartmentalize" the emotional distress he suffered from his 2019 arrest and the distress he suffered as a result of Dimerco's discrimination. Even if Faulk could not do so, the 2019 arrest record would have only minimal probative value in the light of the limited scope of his testimony, which must be weighed against unfair prejudice.

Dimerco also argues, in the alternative, that the district court "could have" introduced a "limited version of the evidence" which omitted the nature of Faulk's charges. This approach would not cure the fundamental problem that the arrest had miniscule probative value. Nor would it cure the prejudice issue because the jury would still be told that Faulk had been arrested for an undisclosed crime. *Barber* concluded that a conviction for possession of a stolen motor vehicle posed a serious risk of prejudice. *See* 725 F.3d at 711, 714. Any criminal history, especially an arrest for a crime so serious as to have to go unnamed, risks a similar prejudicial effect.

Dimerco has failed to provide any persuasive argument that the district court abused its discretion in excluding even a redacted version of the 2019 arrest record.

### b. The District Court Did Not Reversibly Err in Excluding the 2014 Arrest Record.

Dimerco argues that the district court abused its discretion by excluding the 2014 record establishing that Faulk was initially arrested for aggravated assault. It argues that the decision to exclude the record was "without legal justification" and "deprived the jury of critical context" regarding Dimerco's revocation of Faulk's offer. Although Dimerco argued that the record should have been admitted during trial, it did not argue that it required a new trial in its Rule 59 motion.

Faulk argues that Dimerco forfeited its challenge because Dimerco failed to explain *why* "the document should be admitted" in its initial brief. But Dimerco argued that the arrest record was "unmistakabl[y] relevan[t]" in its brief. It contended that the 2014 record lent credibility to Song's testimony, which renders it probative. Dimerco did not forfeit the issue. Faulk also suggests that when Dimerco "accepted the compromise" of not introducing the document but allowing Song to testify to its contents, it failed to explain to the district court why the document had to be admitted. Yet Dimerco explained to the district court why the record should be admitted prior to trial, so it did not forfeit this issue.

Even if we assume that the district court erred in excluding the record, the error was harmless. As explained above, Faulk did

not dispute that he was charged with aggravated assault. And the jury heard Song's testimony that she decided to rescind Faulk's offer based on that charge. Admission of the 2014 arrest record could not possibly affect the jury's determination of her credibility. Dimerco cannot prove that exclusion of the record "probably had a substantial influence on the jury's verdict," so this error cannot support reversal. *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007) (citation and internal quotation marks omitted).

### 3. Cumulative Error Does Not Require a New Trial.

The cumulative-error doctrine provides that "an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (citation and internal quotation marks omitted). When evaluating cumulative error, we "examin[e] any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Id*. Without any "individual claims of error or prejudice," we lack anything to "accumulate." *Id*.

Dimerco argues that even if we conclude that none of the purported errors individually warrants reversal, we should hold that their cumulative effect requires a new trial. We have only one candidate set of errors to combine: exclusion of the 2014 arrest record coupled with Farahany's improper cross-examination of Song. We cannot say that the improper cross-examination, which was cured by an instruction, and the alleged evidentiary error, which

was harmless, together prejudiced Dimerco. Even when we consider the other trial misconduct, the district court did not abuse its discretion in concluding that those other errors did not deprive Dimerco of a fair trial.

*B. The District Court Did Not Abuse Its Discretion in Declining to Remit the Compensatory Damages Award.*

"Our review of a district court's decision not to remit compensatory damages is highly deferential." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 899 (11th Cir. 2011) (citation and internal quotation marks omitted). We are especially deferential in our review of awards for "intangible, emotional harms" because such awards are subjective and "depend[] considerably on the demeanor of the witnesses." *Id.* (citation and internal quotation marks omitted). It is only when a jury's damages award "exceeds the amount established by the evidence" that a remittitur order "reducing a jury's award to the outer limit of the proof is the appropriate remedy." *Goldstein v. Manhattan Indus. Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985).

We allow "a plaintiff's testimony, standing alone," to support an award for emotional distress from discrimination. *Akouri*, 408 F.3d at 1345. "[T]he testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* (citation and internal quotation marks omitted). To prove distress, a plaintiff must "describe" the "harm, mental, emotional, or otherwise, arising from the discrimination." *Id.* "[C]onclusory statements that the plaintiff suffered emotional

distress" will not "support[] an award for compensatory damages." *Id.* (citation and internal quotation marks omitted).

*Bogle v. McClure* is particularly instructive. 332 F.3d 1347 (11th Cir. 2003). In *Bogle*, seven librarians each won a $1 million award for emotional distress from the Atlanta library system to compensate them for racially motivated transfers. *Id.* at 1354, 1358–59. The district court remitted each award to $500,000. *Id* at 1359. The librarians had "testified to the emotional and mental pain they suffered as a result of" their transfers. *Id.* at 1358. They explained that "the race-based transfers effectively destroyed their careers," and some were prompted to "resign or go on worker's compensation." *Id.* at 1358–59. Some testified that they "bec[a]me depressed and one even became suicidal." *Id.* at 1359. We explained that "a plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages." *Id.* We declined to remit the damages award further because "we discern[ed] no reason to substitute our judgment for that of the jury or the district court." *Id.*

*Bogle* controls our decision. True, some of the librarians pointed to more tangible impacts on their lives than others did—resignation or depression, for instance—but the jury gave each librarian an equal award, and we affirmed the awards categorically. *Id.* at 1358–59. In affirming the awards, we reasoned that they were supported because the librarians collectively testified to being "upset, embarrassed, humiliated, and ashamed." *Id.* at 1359 (internal quotation marks omitted). Because Faulk supported his claims of

emotional distress with similar evidence, we have no choice but to affirm the smaller award he received.

Dimerco attempts to distinguish *Bogle* by arguing that, unlike Faulk, the librarians experienced "career-ending racial discrimination." Although Dimerco's choice did not end Faulk's career, the award he received was one-third of the librarians' (adjusted for inflation). And, as the district court found, both his words and demeanor "evidenced profound sadness, anguish, and humiliation." That testimony was sufficient to sustain the awards in *Bogle*, and it is sufficient here.

Dimerco points to two of our decisions it argues support the opposite conclusion. It first points to *Akouri*, where we affirmed a decision remitting a jury award of more than $500,000. 408 F.3d at 1342, 1346. But the plaintiff in *Akouri* failed to "describe any kind of harm, mental, emotional, or otherwise, arising from the discrimination." *Id*. at 1345. That testimony hardly mirrors that before us. More challenging is *Wilson v. Taylor*, an appeal in which we remitted 90 percent of a $100,000 award for emotional distress caused by violations of procedural due process. 733 F.2d 1539, 1549–50 (11th Cir. 1984), *abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989). *Wilson* held that because the plaintiff "d[id] not discuss nor relate any extreme emotional damage or injury" from the defendant's actions, the jury's award was "grossly excessive." *Id*. at 1549–50. Even if *Wilson* could, in a vacuum, sup-

port remittitur, *Bogle* involves a claim of distress arising from unlawful racial discrimination. It is closer on the facts and controls our decision.

Dimerco provides two examples of other circuits remitting damages awards for emotional distress. But both are inconsistent with *Bogle*, which we are bound to follow. *Schandelmeier-Bartels v. Chicago Park District*, for instance, remitted a $200,000 emotional distress award to $30,000 because the plaintiff did not "testify to any lasting emotional or physical ill-effects" from her supervisor's abuse or from losing her job. 634 F.3d 372, 376, 389, 391 (7th Cir. 2011). But we did not rely on the *Bogle* plaintiffs' *ongoing* distress to uphold their awards. *See* 332 F.3d at 1359. Dimerco also points to *Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527 (8th Cir. 1999). The plaintiff in that appeal declined a supervisor's quid-pro-quo sexual advances and was terminated. *Id.* at 529. Her distress was cabined to the "loss of a job," and she provided no evidence of physical injury or treatment for "psychological or emotional injury." *Id.* at 531. But we required none of that from the *Bogle* plaintiffs. We cannot conclude that the district court abused its discretion in declining to remit the damages for emotional distress.

### C. The Jury's Punitive Damages Award Was Not Unconstitutionally Excessive.

The Due Process Clause places substantive limits on the availability of punitive damages awards. *Cote*, 985 F.3d at 846. "[G]rossly excessive" awards "further[] no legitimate purpose and constitute[] . . . arbitrary deprivation[s] of property." *State Farm*

*Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 417 (2003). The Supreme Court has provided three "guideposts" to use in evaluating whether a punitive damages award is unconstitutionally excessive: the "degree of reprehensibility" of the defendant's action, "the disparity between the harm" and the punitive damages award, and the difference between the award "and the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 574–75. Applying these three guideposts to the jury's $3 million punitive award, the district court ruled that "the punitive damages against [Dimerco] are not so excessive as to violate due process." We agree.

1. Dimerco's Conduct Was Exceedingly Reprehensible.

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (alteration adopted) (citation and internal quotation marks omitted). *State Farm* gives us a five-part test for reprehensibility: first, "whether the harm caused was physical as opposed to economic"; second, whether the misconduct "evinced an indifference to or a reckless disregard of the health or safety of others"; third, "whether the target of the conduct was financially vulnerable"; fourth, "whether the conduct involved repeated actions or was an isolated incident"; and fifth, "whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008). Aside from the second factor, which Faulk concedes favors Dimerco, the parties dispute each one. After considering each factor, we conclude that Dimerco's conduct was

exceedingly reprehensible because it employed a racially discriminatory hiring plan despite repeated warnings that this plan was illegal and with full knowledge that it would harm potential employees.

The first factor favors Faulk because we consider emotional harm a species of physical, not economic, harm. *See Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 751 (11th Cir. 2020) (holding that "the district court properly considered [the p]laintiff's emotional distress in weighing th[e first] factor"). We routinely contrast "physical and emotional harm" with economic harm in our reprehensibility analysis. *See, e.g.*, *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1288–89 (11th Cir. 2018); *Goldsmith*, 513 F.3d at 1283 (contrasting "economic harm" with "emotional and psychological harm"). Dimerco tries to distinguish these decisions on the ground that the plaintiffs "suffered emotional *and* physical harm." But we have recognized that emotional harm increases the reprehensibility of a defendant's actions, independent of whether the plaintiff's emotional distress had "physical manifestations." *See Williams*, 947 F.3d at 751.

The third factor favors Dimerco. The district court concluded that Faulk was not "financially vulnerable," and Faulk does not argue that this finding was clearly erroneous. That alone settles our inquiry on this factor. The district court concluded that the third factor favored Faulk because he was "vulnerable to [Dimerco's] ability to take advantage of him without his knowledge." This theory is alien to our caselaw, which has repeatedly cabined

this factor to *financial* vulnerability, even when other theories of vulnerability were available. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1220 (11th Cir. 2010) (holding that a sexual harassment plaintiff operating under a hostile work environment theory satisfied the third factor because her employer "injected a sense of financial vulnerability into their interactions"). Ignoring this caselaw, the district court cited an unpublished opinion that a prisoner satisfied the third *State Farm* factor because even though he was not "financially vulnerable, he was vulnerable as an inmate." *Sepulveda v. Burnside*, 432 F. App'x 860, 865 (11th Cir. June 24, 2011). Faulk does not defend that reasoning. Instead, he argues that he was financially vulnerable because "Liou controlled [Faulk]'s ability to hold the job." This argument entails that *anyone* is financially vulnerable unless self-employed. We have never adopted such a wide-ranging theory.

The fourth factor strongly favors Faulk. The district court found that Dimerco's misconduct "involved repeated actions by individuals high up in the company." It detailed much of the evidence presented at trial documenting Dimerco's racial preferences. In response, Dimerco attempts to relitigate the trial but does not show clear error. It says that Song "handled the Atlanta hiring" and that she revoked Faulk's offer because of his aggravated assault charge, "regardless of his race." But there was abundant record evidence to support the opposite inference, including Howard's, Chou's, and Liou's testimony and the emails between them. Dimerco then argues that the district court's reliance on Liou's policy, and Thibobeaux's hiring, was inappropriate because, quoting *State*

*Farm*, "[p]unitive damages cannot rest on 'dissimilar' conduct un-related to the plaintiff's harm." What *State Farm* condemned was consideration of unrelated business practices instead of "conduct by State Farm similar to that which harmed [the plaintiffs]."538 U.S. at 424. Dimerco's racially motivated hiring practices were con-sistent with its refusal to hire Faulk.

The fifth factor also strongly favors Faulk. As the district court found, Dimerco "engaged in a concerted effort to hire white people despite . . . repeated admonitions . . . that doing [so] would make the company 'guilty of discrimination.'" Dimerco concedes that its discriminatory hiring plan was no "accident." But it argues that its degree of fault was closer to "recklessness" than malice. We have described recklessness as a lower standard than intentional malice. *See Williams*, 947 F.3d at 754. But we have done so where the defendant acted "without any intent to harm [the p]laintiff." *Id*. Dimerco intended to harm Faulk. It intentionally revoked his offer "because of his race." And, when confronted with the illegality of its actions, Dimerco's leadership sought to hide the practice, not

change it. *Cf. id.* ("Defendant promptly corrected its error once advised that it had made a mistake.")

Three of the *State Farm* factors favor Faulk, two of them strongly. These factors support our conclusion that Dimerco's conduct was exceedingly reprehensible and warrants a significant punitive damages award.

### 2. The Ratio of Punitive to Compensatory Damages Is Not Excessive.

"There is no certain ratio at which a constitutionally permissible award is transformed into an unconstitutionally excessive one." *Cote*, 985 F.3d at 848. Instead, the permissibility of the award is "based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425. The Supreme Court nevertheless has "approved of punitive damages awards that are single-digit multipliers of the corresponding compensatory damages awards: 'Single-digit multipliers are more likely to comport with due process . . . than awards with higher ratios.'" *Goldsmith*, 513 F.3d at 1283 (alteration adopted) (quoting *State Farm*, 538 U.S. at 425). The ratio of Faulk's punitive damages to his compensatory damages—7.69 to 1—falls short of "the high end of the range that is ordinarily constitutionally permissible." *Id.*

*Goldsmith* is instructive. We affirmed a punitive damages award arising from a retaliatory termination. *Id.* at 1279–80. We held that the employer's conduct was "reprehensible" because it caused the plaintiff emotional distress and because the employer

"engaged in a pattern of retaliatory and discriminatory misconduct." *Id.* at 1283. Because the misconduct was "exceedingly reprehensible," we were untroubled by a 9.2 to 1 ratio of punitive to compensatory damages. *Id.* at 1283–84. Dimerco's discriminatory conduct too was exceedingly reprehensible, so we are not concerned by an even lower ratio than the one we approved in *Goldsmith*.

Dimerco attempts to reduce the permissible ratio in this appeal from a single-digit ratio to 4 to 1, or even 1 to 1. It appeals to dicta from *State Farm* in support of its argument. But we have never held a single-digit ratio unconstitutionally excessive when a defendant's conduct involved a high degree of reprehensibility. *Compare Goldsmith*, 513 F.3d at 1283–84 (upholding a ratio of 9.2:1), *with Williams*, 947 F.3d at 763 (holding that a 4:1 ratio was the constitutional maximum because the defendant's conduct was not "severely reprehensible"). Dimerco also argues that the ratio is excessive because Faulk's award for emotional distress inherently "contain[s a] punitive element." *See State Farm*, 538 U.S. at 426. But we have affirmed large punitive damages awards accompanying compensatory damages awards given solely for emotional distress. *See Bogle*, 332 F.3d at 1359, 1362 (affirming a $1.9 million punitive damages award accompanying a $500,000 damages award for emotional distress).

Even if Faulk's damages for emotional distress contain some punitive element, Dimerco's conduct was so reprehensible that a higher ratio than the one present here would not offend due process.

Dimerco's most ambitious argument is its suggestion that because the compensatory damages award was "substantial," a 1:1 ratio may be all that is constitutional. In support it cites several decisions from other circuits reducing a punitive damages award to match the compensatory damages award or affirming a decision to do so. But we have made clear that a substantial compensatory damages award may support an even higher punitive damages award when a defendant's misconduct is exceedingly reprehensible. *See Bogle*, 332 F.3d at 1361; *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1320–21 (11th Cir. 2007) (affirming a 5.5:1 punitive damages award accompanying a $3.2 million compensatory damages award). And because Dimerco was undeterred from its discriminatory practices by explicit warnings of their illegality, we conclude that a large punitive damages award is constitutionally appropriate.

Finally, Dimerco lists several decisions by this and other circuits affirming smaller punitive damages awards for "far more severe and prolonged misconduct." But perusing the Federal Reporter to find smaller or larger punitive damages awards will not answer the question in this appeal: whether *this* award, on *these*

facts, is *constitutionally* excessive. The Due Process Clause does not index constitutional excessiveness to a survey of jury awards.

### 3. The Punitive Damages Award Does Not Excessively Deviate from Analogous Civil Penalties.

The final *Gore* guidepost requires us to compare "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at 583. This guidepost looks to "legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (citation and internal quotation marks omitted). It "is accorded less weight than the first two guideposts." *Cote*, 985 F.3d at 850 (alteration adopted) (citation and internal quotation marks omitted).

Dimerco asks us to reduce the punitive damages award in this appeal based on the "100,000 damages cap" for companies Dimerco's size under Title VII. 42 U.S.C. § 1981a(b)(3). We have twice considered and rejected such appeals. *See e.g.*, *Goldsmith*, 513 F.3d at 1284; *Bogle*, 332 F.3d at 1362. Both times we found persuasive that Congress chose not to impose recovery caps on section 1981. *See Goldsmith*, 513 F.3d at 1284–85 (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001)); *Bogle*, 332 F.3d at 1362 (same). We are hesitant to limit recovery under section 1981 when Congress has declined to do so. Although this award exceeds the Title VII cap to

a greater degree than the awards we affirmed in *Goldsmith* and *Bogle*, the reprehensibility of Dimerco's conduct supports the award.

### *D. The District Court Did Not Abuse Its Discretion in Awarding Faulk Attorney's Fees.*

District courts may awards attorney's fees to prevailing plaintiffs under section 1981. *See* 42 U.S.C. § 1988(b). Dimerco asks us to vacate the award "if the underlying final judgment is reversed." Because we affirm the judgment, the district court did not abuse its discretion in awarding Faulk attorney's fees.

### IV. CONCLUSION

We **AFFIRM** the judgment in favor of Faulk.